RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2008 JAN 18  P 3: 04

DEBRA P. HACKETT. CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| BRIDGEWAY MOBILE DIAGNOSTICS, LLC, an Alabama Limited Liability Company, and DONNA HOOVER, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | CASE NO. 2:07-cv-76-WKW |
| TODD P. LINDLEY d/b/a LINDLEY & ASSOCIATES; THEODORE J. HOLT; HACKARD & HOLT, a Partnership; PHIL WATTS ; WATTS & WATTS, a Partnership ; AYLSTOCK, WITKIN & SASSER, a Florida Professional Limited Liability Company, | * * * * * * * * * | **CASE UNDER SEAL** |
| Defendants. | * | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT THEODORE J. HOLT'S NOTICE OF MOTION
AND MOTION TO DISMISS PURSUANT TO
F.R.C.P. RULE 12(b)(2) AND 12(b)(3) AND IN THE ALTERNATIVE,
<u>MOTION TO TRANSFER VENUE</u>**

**George L. Beck, Jr. (BEC011)
Richard H. Allen (ALL052)
Arden Reed Pathak (PAT072)**
Attorneys for Plaintiffs

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
Post Office Box 2069
150 South Perry Street 36104
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile:  (334) 323-8888

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS............................................................ i

TABLE OF AUTHORITIES........................................................ iii

SUMMARY OF POSITION......................................................... 2

STATEMENT OF THE FACTS..................................................... 4

I.   DEFENDANTS' CONTACTS WITH ALABAMA ARISING FROM OR
     RELATED TO THE ORIGINAL CONTRACT. .................................... 4

II.  DEFENDANTS' CONTACTS WITH ALABAMA ARISING FROM OR
     RELATED TO THE 2005 LETTER OF UNDERSTANDING, SUBSEQUENT
     NEGOTIATIONS AND THE SETTLEMENT AGREEMENT IN THE TEXAS
     CASE.................................................................. 9

ARGUMENT ..................................................................... 14

I.   DEFENDANTS ARE SUBJECT TO BOTH SPECIFIC AND GENERAL
     PERSONAL JURISDICTION OF THIS COURT. ................................. 14

     A.   Plaintiffs only need to establish a *prima facie* case
          of personal jurisdiction over Defendants.................. 14

     B.   Two Part Test to Determine Personal Jurisdiction in
          Diversity Actions......................................... 15

     C.   Two-Pronged Due Process Analysis.......................... 16

          1.   Minimum Contacts Analysis............................ 17

               a.   Specific Jurisdiction ............................ 18

                    i.   Practically all of Defendants'
                         contacts with Alabama are
                         "related to" this litigation and
                         support a finding of specific
                         jurisdiction over Defendants ......... 25

                    ii.  Defendants have purposefully
                         availed themselves of the

privilege of conducting activities in Alabama sufficiently to support a finding of specific jurisdiction. ....    27

iii.    Defendants should reasonably have anticipated being haled into court in Alabama.........................    28

b.    General Jurisdiction .............................    29

2.    The exercise of personal jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice.................    31

3.    Defendants waived their right to assert the defense of lack of personal jurisdiction ..........    33

II.    VENUE .....................................................................    35

A.    Venue is proper because a substantial part of the acts or omissions which give rise to the claims occurred in Montgomery. ......................................    36

III.    DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN OF ESTABLISHING THAT THEIR MOTION TO DISMISS FOR *FORUM NON CONVENIENS* REASONS SHOULD BE GRANTED............................    38

A.    Defendants bear a substantial burden in overturning Plaintiffs' choice of their home forum ........................    38

B.    *Forum Non Conveniens* analysis................................    39

1.    Private interests ............................................    40

2.    Public interests..............................................    41

3.    Inconvenience to Plaintiffs ...............................    42

IV.    PLAINTIFFS SHOULD BE ALLOWED JURISDICTIONAL DISCOVERY BEFORE ANY ADVERSE RULING IS ENTERED. .............................    43

CONCLUSION    ..................................................................    44

CERTIFICATE OF SERVICE .....................................................    45

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Akro Corp. v. Luker*, 45 F.3d 1541 (Fed. Cir. 1995)............    25, 26

*Asahi Metal Industry Co. v. Superior Court of California*,
480 U.S. 102 (1987)......................................................    32, 33

*Banco Latino v. Lopez*, 17 F. Supp. 2d at 1332. .................    40, 42

*Bigelow-Sanford, Inc. v. Gunny Corp.*, 649 F.2d 1060
(5th Cir. 1981) ............................................................    28

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985) .........    *passim*

*CIT Group/Equip. Fin., Inc. v. Roberts*, 885 So. 2d 185
(Ala. Civ. App. 2003)....................................................    22

*Consolidated Development Corp. v. Sherritt, Inc.*,
216 F.3d 1286 (11th Cir. 2000).........................................    17

*Del Monte Fresh Produce Co. v. Dole Food Company, Inc.*,
136 F.Supp.2d 1271 (S. D. Fla. 2001)...............................    39

*Delong Equipment Co. v. Washington Mills Abrasive Co.*,
840 F.2d 843 (11th Cir. 1988) .........................................    32

*Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078
(S. D. Fla. 1997)..........................................................    39

*Federal Mogul Corp. v. Universal Constr. Co.*,
376 So. 2d 716 (Ala. Civ. App. 1979)................................    23

*Glass v. Southern Wrecker Sales*, 990 F. Supp. 1344
(M.D. Ala. 1998) ..........................................................    42

*Intercontinental Leasing, Inc. v. Anderson,* 410 F.2d 303
(10th Cir. 1969)............................................................    18

*International Shoe Co. v. Washington*, 326 U.S. 310
(1945).......................................................................    28

*Jenkins Brick Co. v. Bremer,* 321 F.3d 1366
(11th Cir. 2003)............................................................    37

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, (1984) ......    26

*Kelly v. State Dept. of Ins.*, 597 So. 2d 900
(Fla. App. 1992).............................................................    18

*La Seguridad v. Transytur Line*, 707 F.2d 1304
(11th Cir. 1983).............................................................    38, 40

*Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297
(Ala. 1986) .................................................................    21

*Madera v. Hall*, 916 F.2d 1510 (11th Cir. 1990)...................    16

*Magnin v. Teledyne Continental Motors*, 91 F.3d 1424
(11th Cir. 1996).............................................................    39

*Manley v. Engram*, 755 F.2d 1463 (11th Cir. 1985)..............    4

*Matthews v. Brookstone Stores, Inc.,* 431 F. Supp. 2d 1219
(S.D. Ala. 2006).............................................................    34, 35, 43

*Morgan v. North MS Medical Center, Inc.,*
403 F. Supp. 2d 1115 (S.D. Ala. 2005).............................    37

*Nat'l Egg Co. v. Leumi le-Israel B.M.,* 504 F.Supp. 305
(N.D. Ga. 1980).............................................................    28

*Patel v. Howard Johnson Franchise Systems, Inc.*, 928 F. Supp.
1099 (M. D. Ala. 1996) ...................................................    39

*Piper Aircraft Co. v. Reyno*, 454 U. S. 235,
102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)............................    39

*Portera v. Winn-Dixie of Montgomery*, 996 F. Supp. 1418
(M. D. Ala. 1998) ..........................................................    16

*Resolution Trust Corp. v. Deloitte & Touché,* 822 F.Supp.
1512 (D. Colo. 1993)......................................................    18

*Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253
(11th Cir. 1996)................................................ 15, 16, 39, 43

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.,*

207 F.3d 1351 (11th Cir. 2000); ...................................... 16, 31, 32

*S & Davis Intern., Inc. v. The Republic of Yemen,*
218 F.3d 1292 (11th Cir. 2000)............................................ 15

*Sibaja v. Dow Chemical Co.,* 757 F.2d 1215, fn. 4
(11th Cir. 1985)................................................................ 41

*Sterling v. Provident Life & Accident Ins. Co.,*
---F. Supp. 2d----, 2007 WL 1789114,
(M.D. Fla. June 19, 2007).................................................. 36

*Stewart Organization, Inc. v. Ricoh Corp.,* 696 F. Supp. 583
(N. D. Ala. 1988) ............................................................. 39

*Taylor v. Phelan,* 912 F.2d 429, 431 (10th Cir. 1990) ............. 15

*Todd Lindley, Lindley and Associates v. Hackard & Holt,
et al.,* In the United States District Court for the
Northern District of Texas, Case No. 3:05-CV-147-L............ 13

*U. S. Securities & Exchange Comm'n. v. Carrillo,*
115 F.3d 1540, 1542 (11th Cir. 1997)................................. 24, 25, 26

*Wolfson v. S&S Securities,* 756 F. Supp. 374
(N.D. Ill. 1991).................................................................. 18

## Other Authorities

28 U.S.C.A. 1391(a)................................................... 36, 37, 38

F.R.C.P. Rule 12(b)(2) ...................................................... 1

F.R.C.P. Rule 12(b)(3) ....................................................... 1

Wright & Miller, 5(C) *Federal Rules of Civil Procedure,* § 1391,
Waiver of Certain Defenses – Rule 12(h)(1) ............................ 34

ALA. CODE § 10-8A-306(c) ...................................................... 18

CAL. CODE § 16306(a) ........................................................... 18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRIDGEWAY MOBILE DIAGNOSTICS, LLC, an Alabama Limited Liability Company, and DONNA HOOVER, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | CASE NO. 2:07-cv-76-WKW |
| TODD P. LINDLEY d/b/a LINDLEY & ASSOCIATES; THEODORE J. HOLT; HACKARD & HOLT, a Partnership; PHIL WATTS ; WATTS & WATTS, a Partnership ; AYLSTOCK, WITKIN & SASSER, a Florida Professional Limited Liability Company, | * * * * * * * * * | **CASE UNDER SEAL** |
| Defendants. | * | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT THEODORE J. HOLT'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO F.R.C.P. RULE 12(b)(2) AND 12(b)(3) AND IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE

COME NOW Plaintiffs Bridgeway Mobile Diagnostics, LLC and Donna Hoover (hereinafter "Plaintiffs"), and submit this Brief in Opposition to Defendant Theodore J. Holt's Notice of Motion and Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(2) and 12(b)(3) and in the

Alternative, Motion to Transfer Venue and Brief in Support Thereof. For the reasons stated herein, it is clear that this Court has both specific and general personal jurisdiction over Defendants.[1] Further, venue is proper in this district and Defendants have failed to prove that California would be a more convenient forum.

## SUMMARY OF POSITION

Defendants "reached out" from the boundaries of California and established multiple continuing contractual relationships with Plaintiffs. Defendants knew Plaintiffs were Alabama residents at the time these relationships were established. First, Plaintiffs' echocardiogram testing and screening services were performed pursuant to a written contract executed in 2002 that was ratified and affirmed by Defendants, and upon which Defendants received substantial benefits. Defendants knew that much of the echocardiogram services to be provided to them by Plaintiffs would be performed in Alabama. Further, together Ted Holt and other representatives of Hackard & Holt maintained regular contact with Plaintiffs during the course of Plaintiffs' echocardiogram services, including specifically directing and increasing Plaintiffs' work for the benefit of Defendants. Second, the

---

[1]     It appears that the present motion seeks only the dismissal of Defendant Theodore J. Holt individually, (hereinafter "Ted Holt") on personal jurisdiction grounds, and not the dismissal of Defendant Hackard & Holt, a general partnership (hereinafter, Ted Holt and Hackard & Holt referred to as "Defendants"). However, since footnote 1 of the motion references the dismissal of Hackard & Holt, and because a finding of personal jurisdiction over Hackard & Holt would also conclusively establish personal jurisdiction over all of its partners (including Ted Holt), see infra, pp. 17-18, Plaintiffs will establish that personal jurisdiction exists over Hackard & Holt.

2

2005 Letter of Understanding is another contract with Plaintiffs that was ratified and affirmed by Defendants, and upon which Defendants received substantial benefits.     Third, during the course of these proceedings, Defendants entered into a third contract that is enforceable by Plaintiffs, *i.e.,* Plaintiff Bridgeway was named as an intended third-party beneficiary in a settlement agreement between Todd Lindley and Defendants, which was entered as an order of the Texas Court.[2]  In addition to these contracts, Defendants have been engaged in regular communication with Plaintiffs' counsel over the last several years while Plaintiffs have attempted to resolve these disputes.     These facts alone are sufficient to establish specific personal jurisdiction over Defendants.

In addition to those contacts with Alabama, Defendants have purposefully directed activities at Alabama in efforts to obtain Fen-Phen clients from Alabama, and have actually represented Alabama residents in such litigation.     These facts not only strengthen a finding of specific jurisdiction, but also support a finding of general personal jurisdiction, when considered in conjunction with Defendants' long and continuous relationship with Plaintiffs.

Finally, Defendants have failed to present any substantive argument establishing that venue is improper in this district, nor any evidence demonstrating that California is a more convenient forum.   Plaintiffs, who

---

[2]      Plaintiffs intend to amend their Verified Complaint in order to seek recovery pursuant

are Alabama residents, have chosen their home forum in which to pursue this action, which seeks compensation for damages sustained by Plaintiffs in Alabama. Such choice is entitled to great deference. Defendants' unsupported allegations concerning the inconvenience of this forum fall woefully short of overcoming the deference given to Plaintiffs' choice of forum. In fact, an analysis of the private and public factors relevant to a *forum non conveniens* argument clearly demonstrate that Alabama is the more convenient forum.

## STATEMENT OF THE FACTS

### I. DEFENDANTS' CONTACTS WITH ALABAMA ARISING FROM OR RELATED TO THE ORIGINAL CONTRACT.

Plaintiff Donna Hoover is a citizen of the State of Alabama with her principal primary residence located at 13331 County Road 7, Troy, Alabama.[3]   [Ex. A, Hoover Aff. at ¶ 2]   Plaintiff Bridgeway Mobile Diagnostics, LLC is an Alabama limited liability company with its primary place of business in Montgomery, Alabama. [Ex. A, Hoover Aff. at ¶ 2]

Some time in January or February, 2002, Mrs. Hoover was contacted at her offices in Alabama by Defendant Todd Lindley, or representatives of

---

to Defendants' breach of that third contract based upon third party beneficiary rules.

[3]    Mrs. Hoover temporarily resides in the State of Georgia while her husband participates in a medical residency program. [Ex. A, Hoover Aff. at ¶ 2] Mrs. Hoover intends to return to Alabama after the completion of her husband's medical residency program. [Ex. A, Hoover Aff. at ¶ 2] Mrs. Hoover's driver's license and vehicle registration remain with the State of Alabama, she pays taxes in Alabama and is registered to vote in the State of Alabama.   [Ex. A, Hoover Aff. at ¶ 2]   "[I]t is individual's 'permanent' residence, *i.e.*, his domicile, that is benchmarked for determining proper venue. *Manley v. Engram*, 755 F.2d 1463, 1466 fn. 3 (11th Cir. 1985).

4

his law firm, about providing echocardiogram testing and screening services in connection with potential clients for Defendant Lindley and other law firms (including Defendants) in potential Fen-Phen litigation. [Ex. A, Hoover Aff. at ¶ 3] Plaintiff orally agreed to perform such services, and later executed a written contract with Defendant Lindley while in Alabama. [Ex. A, Hoover Aff. at ¶ 3] Although not signatories to the contract, almost from the inception of Plaintiffs' performance, Defendants communicated with Plaintiffs and were aware that Plaintiffs were Alabama residents from whom they would be receiving the benefit of service. [Ex. A, Hoover Aff. at ¶ 3]

It was originally contemplated by the parties that reports and other materials produced by Plaintiffs in performance of their contractual duties would be sent directly to Defendant Lindley, who would thereafter disseminate the information to Defendants and other national law firms. [Ex. A, Hoover Aff. at ¶ 4] However, almost from the very beginning of Plaintiffs' performance, Lindley was unable to forward Plaintiffs' material to Defendants and the other law firms in a timely or efficient manner. [Ex. A, Hoover Aff. at ¶ 4] Due to these logistical problems, within just a few weeks after the execution of the original contract, and thereafter continuing throughout Plaintiffs' performance, representatives of Hackard & Holt (including Ted Holt) communicated directly with Plaintiffs while Plaintiffs were in Alabama regarding Plaintiffs' performance. [Ex. A, Hoover Aff. at ¶ 4] These communications included dozens of phone calls to Plaintiffs' office

5

in Alabama and extensive written communications directed to Plaintiffs in Alabama.[4]   [Ex. A, Hoover Aff. at ¶ 4]   Direct communication with Defendants occurred on a nearly daily basis. [Ex. A, Hoover Aff. at ¶ 4]

More specifically, during the course of Plaintiffs' performance, Plaintiffs communicated extensively with Hackard & Holt representatives Elisa Zitano, Alisa Holt and Brad McDowell.   [Ex. A, Hoover Aff. at ¶ 5]   These representatives of Defendants provided Plaintiffs (while Plaintiffs were in Alabama) specific direction and instructions as to how Plaintiffs should perform services for Defendants.  [Ex. A, Hoover Aff. at ¶ 5]  Defendants provided Plaintiffs with Defendants' federal express billing number so that Plaintiffs could send test results and other material directly to Defendants. [Ex. A, Hoover Aff. at ¶ 5]  Plaintiffs estimate that they sent approximately 30 packages containing Plaintiffs' work products directly to Defendants based upon Defendants' instructions. [Ex. A, Hoover Aff. at ¶ 5]

Further, Defendants requested that Plaintiffs purchase new equipment in order to better perform their services. [Ex. A, Hoover Aff. at ¶ 5]  As a result of this request, Plaintiffs contracted to lease and purchase two new ultrasound CYPRESS machines to more quickly facilitate the testing desired by the Defendants and to produce the tape or documentation requested by

---

[4]     Attached to Mrs. Hoover's Affidavit dated November 7, 2007 (submitted with Plaintiffs' Motion for Default Judgment) are copies of some of the written communications with Defendants, along with other material associated with work done on behalf of Defendants. [Doc. 32, Ex. A at Attachment 4] In addition to directing Plaintiffs' initial work, Defendants also instructed Plaintiffs to obtain re-reads or re-verification of previous tests as

6

said Defendants.  [Ex. A, Hoover Aff. at ¶ 5]  The acquisition of these two new machines required the Plaintiffs to obligate themselves to pay $119,000.00.  [Ex. A, Hoover Aff. at ¶ 5]  As a result of the failure of Defendants to pay Plaintiffs as agreed, the machines were foreclosed on, repossessed and a deficiency balance assessed against the Plaintiffs.  [Ex. A, Hoover Aff. at ¶ 5]

At some time around August 2002, Defendants also directed Plaintiffs to start preparing separate tapes for Defendants' clients or potential clients.  [Ex. A, Hoover Aff. at ¶ 6]  Previously, Plaintiffs had put all clients or potential clients (i.e., those for Defendants and Defendant Lindley) on one tape and had forwarded a single report to Lindley. [Ex. A, Hoover Aff. at ¶ 6]  However, pursuant to Defendants' direction, Plaintiffs began maintaining separate logs for Defendants' clients or potential clients.  [Ex. A, Hoover Aff. at ¶ 6][5]  Plaintiffs would thereafter forward those separate tapes to physicians for readings, and would later forward the results directly to Defendants.  [Ex. A, Hoover Aff. at ¶ 6]  All of this additional work (i.e., above and beyond Plaintiffs' original scope of work) was done on the instructions of Defendants.  [Ex. A, Hoover Aff. at ¶ 6]

Importantly, Ted Holt called Mrs. Hoover while she was in Birmingham some time in September or October 2002.  [Ex. A, Hoover Aff. at ¶ 7]  Mr.

---

late as April, 2003, and demanded that their request for information be given priority. [Doc. 32, Ex. A at ¶ 5]

7

Holt's call came at a time when Plaintiffs were considering stopping performance under the contract. [Ex. A, Hoover Aff. at ¶ 7]   Mr. Holt attempted to, and in fact did, persuade Plaintiffs to keep performing under the contract.  Mr. Holt informed Mrs. Hoover that he knew she was unhappy, but requested that Plaintiffs still work with Defendants and get Defendants the necessary information so that the Fen-Phen cases could proceed, and Plaintiffs could thereafter receive payment. [Ex. A, Hoover Aff. at ¶ 7]   Mr. Holt represented that if Plaintiffs continued to work and the cases proceeded to a successful conclusion, that this would be the best way for Plaintiffs to get paid.   [Ex. A, Hoover Aff. at ¶ 7]   In reliance upon Mr. Holt's representations, Plaintiffs continued to perform and such performance significantly benefited Defendants. [Ex. A, Hoover Aff. at ¶ 7]

Plaintiffs tested potential Fen-Phen claimants in at least six locations in Alabama.[6]   [Ex. A, Hoover Aff. at ¶ 8]   This testing directly benefited Defendants in that it allowed Defendants to determine which parties to accept as clients. [Ex. A, Hoover Aff. at ¶ 8]  Plaintiffs tested and provided screening services to 226 individuals at these sites in Alabama.   [Ex. A, Hoover Aff. at ¶ 8]  Plaintiffs estimate that 60 to 70% of the patients tested

---

[5]   Examples of the separate logs maintained by Plaintiffs at the direction of Defendants are included in Attachment 4 to Mrs. Hoover's Affidavit dated November, 2007. [Doc. 32, Ex. A at Attachment 4]

[6]   The Plaintiffs generated a log of all testing conducted beginning in 2002 and transmitted that log to the Defendants. [Doc. 32, Ex. A at Attachment 1; Doc. 32, Ex. B at Attachment 1]  The log contained the date of the test, the site of the test, the name of the doctor who made the first and if applicable, the second reading, and whether or not the potential client tested positive or negative.  These logs accurately reflect that testing was

by them in Alabama were for clients or potential clients of Defendants. [Ex. A, Hoover Aff. at ¶ 8]

Plaintiffs provided echocardiogram testing and screening services for Defendants from early 2002 through 2003. [Ex. A, Hoover Aff. at ¶ 9] Although patient testing ended in December 2002, Plaintiffs received nearly daily instructions from Defendants as late as April 2003 regarding work done directly for Defendants. [Ex. A, Hoover Aff. at ¶ 9; Doc. 32, Ex. A at Attachment 4] It is also important to note that Defendants knowingly benefited from the diagnostic reading services of four Montgomery, Alabama doctors, Drs. Salvia, Garcia, Hastey and Brazil. [Ex. A, Hoover Aff. at ¶ 9]

## II.   DEFENDANTS' CONTACTS WITH ALABAMA ARISING FROM OR RELATED TO THE 2005 LETTER OF UNDERSTANDING, SUBSEQUENT NEGOTIATIONS AND THE SETTLEMENT AGREEMENT IN THE TEXAS CASE.

As a result of the failure to pay Plaintiffs in accordance with the terms of the original contract, on or about March 2, 2005, a settlement was reached regarding payment to be made to Plaintiffs for the echocardiogram services performed by Plaintiffs. [Doc. 1, Verified Complaint at ¶ 25] A copy of that Letter of Understanding, signed by Defendant Lindley, is attached to the Verified Complaint [Doc. 1] as Exhibit A.

In the Letter of Understanding, Plaintiffs were to receive $10,000.00 within sixty (60) days of execution of the Letter of Understanding and receive the balance of the $600,000 at the rate of $1,500.00 per client that

performed on behalf of Defendants in the following Alabama sites:   Montgomery,

9

was referred to the defendant law firms from settlement proceeds. [Doc 1, Verified Complaint at ¶ 28]    In said agreement, Defendant Lindley represented that 453 cases were handled as positive cases by Lindley and five other law firms.  [*Id.*]  Defendant Lindley represented that he would forward the master list to each firm (including Defendants) for administration of payment of $1,500.00 per case directly to the Plaintiffs upon receipt of settlement funds.  [*Id.*]

On April 21, 2005, Defendant Lindley sent a correspondence to Defendants regarding the Letter of Understanding, enclosed a copy of the agreement, enclosed a master list of clients on which the Plaintiffs "originally performed the technician services," and on which the Plaintiffs "should receive payment."  [Doc. 1, Verified Complaint at Ex. D].  On or about August 31, 2005, Jack B. Krona, Jr., attorney for Defendant Lindley, notified the Plaintiffs that the Defendants agreed to honor the terms of the Letter of Understanding.  [Doc. 1, Verified Complaint at Ex. E].  On or about October 10, 2005, Defendant Lindley again transmitted identical copies of the Letter of Understanding to the Defendants.  [Doc. 1, Verified Complaint at Ex. F]. Later, the Defendants acknowledged receipt of the Letter of Understanding and acknowledged their duties under the Letter of Understanding.  [Doc. 1, Verified Complaint at ¶ 34]  Attached hereto as Exhibit B are two letters from the undersigned dated August 15, 2006 and December 19, 2006

---

Birmingham, Mobile, Bessemer, Troy and Auburn. [Ex. A, Hoover Aff. at ¶ 8]

confirming this understanding.     Relying upon Defendants' apparent

confirmation of the Letter of Understanding, the Plaintiffs postponed bringing

this action for almost two years.[7]  Plaintiffs brought this action as soon as

practical after it became apparent that the Defendants had no intent to

honor the Letter of Understanding.

Further, during the course of these proceedings, Defendants have

directed significant activity to Alabama in a purposeful effort to delay the

actual litigation of the merits of this case. Specifically, on January 26, 2007,

the Court conducted a telephone conference regarding Plaintiffs' TRO

request.  During this teleconference, Peter Holt appeared on behalf of the

Defendants and disputed Plaintiffs' entitlement to a TRO.[8]    During the

teleconference, and immediately thereafter, Mr. Holt represented that the

Defendants were willing to cooperate with Plaintiffs and would be willing to

set aside $1,500 of settlement proceeds on all relevant cases, and that

Defendants would be willing to provide a complete list of all their clients

upon whom Plaintiffs had provided testing and screening services. [Doc. 23,

---

[7]     During this "delay" period, the Defendants secretly settled numerous Fen-Phen cases without paying Lindley or Plaintiffs, or even notifying them of the settlements. [Ex. C at pp. 1, 3-5] It is apparent from Defendants' actions both before and after the filing of this lawsuit, that Defendants intend to delay this litigation as long as possible so that as many Fen-Phen cases as possible can be settled before Plaintiffs can receive a judgment, presumably so that Defendants can retain settlement proceeds that would otherwise go to Plaintiffs.

[8]     To the best recollection of the undersigned, Mr. Holt did not voice any objection to the Court's exercise of jurisdiction over Defendants at the time of the TRO hearing. Plaintiffs have requested a copy of the transcript of this hearing in order to confirm that, and the Court has already granted on extension to allow the court reporter to prepare that transcript. As of the date of this filing, the transcript had not been prepared.  Rather than

11

Ex. A at ¶ 2] Mr. Holt later confirmed this agreement in a letter to Plaintiffs' counsel. [Doc. 23, Ex. A at ¶ 2] In that letter, Mr. Holt requested that Plaintiffs provide the Defendants a log of all individuals tested by Plaintiffs so that the Defendants would know for which cases they needed to set aside the $1,500. [Doc. 23, Ex. A at Attachment 1] Even though Plaintiffs' counsel had provided such a log on multiple occasions in the past, Plaintiffs' counsel on at least four separate occasions again provided the case log to the Defendants, including preparing and providing the Defendants an alphabetized list upon request. [Doc. 32, Ex. C at ¶ 2] Despite these cooperative efforts, Plaintiffs' counsel never received the complete client list as promised by Defendants. [Doc. 32, Ex. C at ¶¶ 2 and 3]

Due to the Defendants' refusal to fulfill their commitment, on April 2, 2007, Plaintiffs filed a motion for entry of default and a motion for partial default judgment against the Defendants. [Docs. 22 and 23]. Prior to the clerk's entry of default, Plaintiffs withdrew their motions based upon the renewed representation of the Defendants that they would provide to Plaintiffs a complete client list. [Doc. 24 at ¶ 2; Doc. 32, Ex. C at ¶ 3]. Despite numerous requests by Plaintiffs thereafter for the list and numerous representations by the Defendants that the list would be provided, the Defendants never provided the complete list. [Doc. 32, Ex. C at ¶ 3] The Defendants did provide the first page of an alphabetized list (containing 47

---

seek another extension for the filing of this opposition, Plaintiffs simply reserve the right to

names) of individuals who were clients of the Defendants and upon whom Plaintiffs performed testings. [Doc. 32, Ex. C at ¶ 4] This list contained only names beginning with the letter A and some names starting with the letter B. [*Id.*] For reasons known only to the Defendants, they have refused to provide the complete list. [*Id.*] The Defendants later requested that Plaintiffs provide the actual cost of the tests performed on its clients so that this amount could be disclosed to the clients upon settlement. [Ex. C] Plaintiffs agreed to provide that information as soon as Defendants provided the complete client list. [*Id.*] No such client list has ever been produced by Defendants.

Notably, during the course of these proceedings Todd Lindley and Defendants entered into a settlement agreement in their case styled *Todd Lindley, Lindley and Associates v. Hackard & Holt, et al.*, In the United States District Court for the Northern District of Texas, Case No. 3:05-CV-147-L (the "Texas Case"). [Doc. 27, Ex. C] The terms of this settlement agreement were read into the proceedings of the Texas Case, and adopted by that court as an order. [Doc. 27, Ex. C at p. 22][9] In the settlement agreement/order, Defendants acknowledged and agreed that Bridgeway would be paid in accordance to the terms of the prior contracts. The

---

supplement this opposition whenever the transcript is finalized.
[9] The Texas Case involves a payment dispute between Lindley and Defendants arising from approximately 1,100 Fen-Phen cases referred by Lindley to Defendants. [Doc. 27, Ex. C at p. 19]. A substantial number of those cases involved clients upon whom Plaintiffs performed testing and related services.

13

settlement agreement/order in the Texas Case contains the following provision:

> Fourteen, in cases where Bridgeway performed the echocardiogram, they will be paid per the agreement with Bridgeway or subsequent modifications of the agreement with Bridgeway.

[Doc. 27, Ex. C at p. 9]  Bridgeway is clearly an intended third-party beneficiary of this contract.  Defendants have now repudiated all of their obligations under this settlement agreement/consent judgment.  [Ex. D at pp. 1-2, 8]  Defendants' breach/repudiation of this settlement agreement/order has clearly caused foreseeable injury to Plaintiffs in Alabama.

## ARGUMENT

### I. DEFENDANTS ARE SUBJECT TO BOTH SPECIFIC AND GENERAL PERSONAL JURISDICTION OF THIS COURT

#### A. Plaintiffs only need to establish a *prima facie* case of personal jurisdiction over Defendants

When the trial court conducts no evidentiary hearing on a defendant's motion to dismiss for lack of personal jurisdiction, the standard which a district court uses in determining whether or not personal jurisdiction exists over a non-resident defendant is as follows:

> The plaintiff bears the burden of establishing personal jurisdiction over the defendant.  Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the bases of affidavits and other written materials, the plaintiff need only make a prima facie showing.  The allegations in the complaint must be taken as true to the extent they

14

are uncontroverted by the defendant's affidavits. *If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.*

*S & Davis Intern., Inc. v. The Republic of Yemen,* 218 F.3d 1292, 1303 (11th Cir. 2000) (emphasis added) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990) (emphasis added). *See also, Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 255 (11th Cir. 1996).

As discussed in more detail below, the allegations contained in Plaintiffs' Verified Complaint, the affidavit testimony submitted herewith and previously submitted evidentiary material clearly establishes a *prima facie* case of personal jurisdiction over Defendants. To the extent that any of Plaintiffs' allegations are controverted by Defendant's evidence, Plaintiffs are entitled to all reasonable inferences. To the extent Plaintiffs' affidavit testimony conflicts with Defendants' affidavit testimony, all such factual disputes are to be resolved in favor of Plaintiffs. *See, supra, S & Davis Intern., Inc. v. The Republic of Yemen*, 218 F.3d at 1303.

## B. Two Part Test to Determine Personal Jurisdiction in Diversity Actions

In a diversity action, in order to determine if personal jurisdiction may be asserted over a non-resident defendant, the district court must engage in a two part test. *See, e.g., Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d at 256. This test has been described as follows:

15

> First, we consider the jurisdictional question under
> the state long-arm statute. If there is a basis for the
> assertion of personal jurisdiction under the state
> statute, we next determine whether sufficient
> minimum contacts exist to satisfy the Due Process
> Clause of the Fourteenth Amendment so that
> "maintenance of the suit does not offend 'traditional
> notions of fair play and substantial justice.'" Only if
> both prongs of the analysis are satisfied may a
> federal or state court exercise personal jurisdiction
> over a nonresident defendant.

*Id.* (quoting *Madera v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (internal

citations omitted).

Because Alabama's long-arm statute is co-extensive with due process

limits, courts in Alabama only have to engage in the single step of

determining if the exercise of personal jurisdiction comports with due

process requirements. *See Ruiz de Molina v. Merritt & Furman Ins. Agency,*

*Inc.,* 207 F.3d 1351, 1355-56 (11th Cir. 2000); *Portera v. Winn-Dixie of*

*Montgomery*, 996 F. Supp. 1418, 1423 (M. D. Ala. 1998).

## C.   Two-Pronged Due Process Analysis

The due process analysis itself involves a two part test.

*Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d at 258. The two part due

process test has been stated as follows:

> We engage in a two-prong inquiry to determine
> whether asserting personal jurisdiction over
> nonresident defendants comports with due process.
> First, we must decide whether each defendant has
> established "minimum contacts" with [the forum].
> Second, we must determine whether the exercise of
> personal jurisdiction would offend "'traditional
> notions of fair play and substantial justice.'"

16

*Id.* at 258 (citations omitted).

### 1.   Minimum Contacts Analysis

While "minimum contacts" is the guide to any personal jurisdiction inquiry, the nature and quality of these required "minimum contacts" varies depending upon whether a court is attempting to assert specific or general jurisdiction over the non-resident defendant. *Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). This rule has been articulated as follows:

> Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. . . . The requirement that there be minimum contacts is grounded in fairness. It assures that "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there."
>
> . . .
>
> General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state.

*Id.* at 1291-92 (citations omitted).

Should the Court find that it has either specific or general personal jurisdiction over Hackard & Holt, a general partnership, then it necessarily must find that it has personal jurisdiction over Ted Holt, its managing

17

partner. *See, e.g., Wolfson v. S&S Securities,* 756 F. Supp. 374, 377 (N.D. Ill. 1991) ("Since the Court has jurisdiction over the partnership, jurisdiction also exists over the general partners.") *See also, Intercontinental Leasing, Inc. v. Anderson,* 410 F.2d 303 (10th Cir. 1969) ("Through the instrumentality of the partnership, the individual partners purposefully availed themselves of the privilege of conducting business activities in Kansas and invoked the benefits of protections of its laws to satisfy their personal economic desires."); *Resolution Trust Corp. v. Deloitte & Touché,* 822 F.Supp. 1512, 1514 (D. Colo. 1993) (same); *Kelly v. State Dept. of Ins.,* 597 So. 2d 900, 902 (Fla. App. 1992) ("There are a number of cases that hold that a non-resident partner can be constitutionally subjected to personal jurisdiction in the forum where the partnership has conducted business.") (See cases cited therein).[10]

### a.    Specific Jurisdiction

The United States Supreme Court has specifically addressed the analysis to be used in determining whether specific personal jurisdiction exists over a non-resident defendant in a contractual setting. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985). In *Burger King,* defendants, two Michigan residents, entered into a franchise agreement with Burger King, a Florida corporation. Pursuant to the franchise agreement,

---

[10]    In a general partnership, be it in Alabama or California, "all partners are jointly and severally liable for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." ALA. CODE § 10-8A-306(a). CAL. CORP. CODE § 16306(a).

defendants were to own and operate a Burger King restaurant in Michigan. After defendants allegedly breached the franchise agreement, Burger King brought suit against defendants in Florida. Defendants asserted that the Florida court lacked personal jurisdiction over them.

The Supreme Court began its analysis by broadly stating that due process requires that foreign defendants have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign" before personal jurisdiction may be asserted against that defendant. *Id.* at 472 (internal citations omitted). The Court stated that "[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* The Court more specifically stated that "with respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.*

The Court noted several reasons why allowing the exercise of personal jurisdiction over a foreign defendant which has "purposefully directed" activities toward a forum is fair. The Court stated as follows:

> We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a

19

non-resident who "purposefully directs" his activities toward forum residents. ***A State generally has a "manifest interest" in providing its residents with a convenient forum for addressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account to other States for consequences that arise proximately from such activities***; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.

*Id.* at 473-74 (citations omitted) (emphasis added).[11]

The Court ultimately found that the Michigan defendants had established sufficient minimum contacts with the State of Florida. *Id.* The Court was unpersuaded by the fact that all of defendants' performance under the contract was performed in Michigan. *Id.* Despite this, the Court

---

[11]    The Court in *Burger King* also noted that a finding of personal jurisdiction may not be avoided merely because the defendant did not physically enter the forum state. *Id.* at 476. The Court stated as follows:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* (citations omitted).

20

found that the defendants had deliberately "reached out" beyond Michigan and entered into a contractual relationship with a Florida corporation. *Id.* at 479-80. The Court emphasized that the defendants' purposeful establishment of this relationship with a Florida company could in no sense be viewed as "random, fortuitous or attenuated." *Id.* Further, the Court was persuaded by the fact that the defendants' actions caused clearly foreseeable injuries to the corporation in Florida. *Id.* Thus, the Court held that specific personal jurisdiction was proper over these defendants in Florida. *Id.*

Like the defendants in *Burger King*, Defendants "reached out" and established continuing contractual relationships with two Alabama residents. Defendants will likely argue that because they did not sign the original services contract or the Letter of Understanding, no contractual relationship exists between them and Plaintiffs. Although the Defendants did not sign the contracts, the Defendants, by their actions, affirmed and ratified the terms of the contracts and are therefore bound by them. See, *e.g., Lawler Mobile Homes, Inc. v. Tarver,* 492 So. 2d 297, 305 (Ala. 1986). ("[A] party by his actions and acceptance of the benefit of the contract and by operating under that contract, may ratify and confirm it …"). As detailed above, not only did the Defendants knowingly accept the benefit of Plaintiffs' echocardiogram services under the original contract, they actually maintained nearly daily contact with Plaintiffs and specifically directed

21

Plaintiffs' work for their own benefit. These nearly daily instructions that Defendants directed at Plaintiffs while Plaintiffs were in Alabama alone are enough to establish personal jurisdiction. Further, by their own actions the Defendants expressly ratified and affirmed the contract and are bound by it. Alternatively, at the very least, an implied contract was established between Plaintiffs and Defendants allowing Plaintiffs to recover on their equitable claims (Counts V and VIII of the Verified Complaint). *See, e.g., CIT Group/Equip. Fin., Inc. v. Roberts,* 885 So. 2d 185, 189 (Ala. Civ. App. 2003). Alabama law states as follows:

> "There are two kinds of implied contracts – those implied in fact and those implied in law. Contracts implied in law are more properly described as *quasi* or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment.'"

> "The rule is that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one so accepts with knowledge, to pay the reasonable value of such services rendered." In order to succeed on a claim of unjust enrichment, the plaintiff must show that he had a reasonable expectation of compensation for his services.

*CIT Group/Equip. Fin. Group v. Roberts*, 885 So. 2d at 189-90 (citations omitted). Again, not only did the Defendants knowingly accept the benefits of Plaintiffs' services, they actually extensively directed Plaintiffs' work (for their benefit, including changing and adding to Plaintiffs' scope of work). Indeed, Ted Holt personally convinced Plaintiffs to continue with their

22

performance for his own benefit. Under these facts, there is at least an implied contract between the Defendants and Plaintiffs, obligating Defendants to compensate Plaintiffs.

Similarly, as detailed above, Defendants affirmed and ratified its obligations contained in the Letter of Understanding. The Defendants received significant benefit as a result of their ratification of the Letter of Understanding, *i.e.,* Plaintiffs' withheld filing suit for almost two years. It is also significant that the Defendants recently entered into a settlement agreement with Defendant Lindley in which Bridgeway was named as an intended third party beneficiary.[12] Defendants certainly knew at the time of entering into this third contract that a breach of their obligations under that settlement agreement would lead to injuries in Alabama.

The Defendants' purposeful establishment of these contractual relations with Plaintiffs cannot be viewed as "random, fortuitous or attenuated." *Burger King Corp. v. Rudzewicz,* 471 U.S. at 479-80. In addition, Defendants' breach of their contractual and legal obligations with these Alabama residents caused clearly foreseeable injuries in Alabama. Obviously, litigation was foreseeable, indeed probable, in Alabama if Defendants breached any, much less all, of their contractual and legal obligations with Plaintiffs. Further, Defendants have clearly benefited by

---

[12]     Under Alabama law, a third person has enforceable rights under a contract between others when the contracting parties *intend* that the third person receive a direct benefit enforceable in court (as opposed to an "incidental" benefit). *Federal Mogul Corp. v. Universal Constr. Co.,* 376 So. 2d 716, 723-24 (Ala. Civ. App. 1979).

23

Plaintiffs' performance, including Plaintiffs' extensive performance while in Alabama. Such benefits include, at the very least, being provided necessary information to determine which claimants to accept as clients. Indeed, Plaintiffs tested at least 226 potential Fen-Phen claimants at six different locations in Alabama, all for the benefit of Defendants. "But for" Plaintiffs performance, which was directed by Defendants, Defendants would not have been able to obtain hundreds of clients. Clearly, Defendants have "purposefully directed" their activities at Alabama residents and received significant benefits as a result. Thus, just like the defendants in *Burger King*, Defendants are subject to specific personal jurisdiction.

The Eleventh Circuit, based upon the guidance of the *Burger King* decision, has adopted a three part test to determine if a foreign defendant's contacts with a forum establish specific personal jurisdiction. The test has been stated as follows:

> [T]he defendant's contacts with the applicable forum must satisfy three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*U. S. Securities & Exchange Comm'n. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (citations omitted) (Court held that simply releasing

24

advertisements which are reasonably calculated to reach the forum in question is sufficient for purposeful availment purposes).

> **i.    Practically all of Defendants' contacts with Alabama are "related to" this litigation and support a finding of specific jurisdiction over Defendants**

Plaintiffs initially note that Defendants' establishment of multiple contractual relationships with two Alabama residents, along with a consideration of the communications and instructions Defendants directed to Plaintiffs while in Alabama (which are discussed above), are clearly sufficient to establish specific personal jurisdiction. *See Burger King Corp. v. Rudzewicz,* 471 U. S. at 478-79.   Obviously, these contacts not only are "related to" this litigation, but actually "give rise" to the litigation.

However, this Court must also consider in its specific jurisdiction analysis the contacts Defendants established with Alabama related to potential and actual representation of Alabama residents in Fen-Phen litigation (*i.e.,* marketing efforts directed at Alabama and actual representation of Alabama residents).   Defendants may argue that these contacts with potential and actual Fen-Phen clients in Alabama are not sufficiently "related to" this litigation to be considered in the Court's specific jurisdiction analysis.[13]   However, in *U. S. Securities & Exchange Comm'n. v.*

---

[13]    The law with respect to this issue is somewhat unsettled.   As one circuit has expressly noted, "[t]he Supreme Court has avoided general pronouncements on the nexus required to satisfy this 'arise out of or relate to' prong of the due process inquiry." *Akro Corp. v. Luker,* 45 F.3d 1541, 1547 (Fed. Cir. 1995).   However, the Supreme Court has made it clear that the test is not so strict as to require that the plaintiff be the forum

25

*Carrillo*, 115 F.3d at 1544 , the Eleventh Circuit specifically rejected a strict test as to what contacts would be considered "related to" a plaintiff's action for specific jurisdiction purposes. Rather, the Court adopted a more liberal interpretation of the rule and considered certain "steps" taken by the defendant which led up to defendant's actual alleged fraud as relevant contacts. *Id.*

Clearly, Defendants' efforts to obtain Fen-Phen clients from Alabama, and representation of Alabama residents, is "related to" this litigation. In particular, Plaintiffs tested no fewer than 226 potential clients in Alabama. Further, it is believed that Defendants have represented dozens of Alabama residents in Fen-Phen cases; most, if not all, having been tested by Plaintiffs.[14]   By reviewing Plaintiffs' testing logs [Doc. 32, Ex. A at Attachment 1; Ex. B at Attachment 1], Plaintiffs do know that at least eight Alabama residents (or at least individuals that were tested in Alabama) are shown as clients or potential clients of Hackard & Holt on an April 8, 2003

_____

resident toward whom any, much less all, of the defendant's relevant activities were purposefully directed. *See, Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). It should further be noted that "'it [is] significant that the constitutional catch-phrase ['arise out of or relate to'] is disjunctive in nature,' indicating 'added flexibility and signal[ing] a relaxation of the applicable standard' from a pure 'arise out of' standard." *Akro Corp. v. Luker*, 45 F.3d at 1547 (citations omitted) (the Court in *Akro* ultimately held that an exclusive licensing agreement which defendant entered into with plaintiff's competitor was sufficiently related to plaintiff's action which sought a declaration that the defendant's patent was invalid).

[14]    Because Defendants have not provided the promised client list discussed herein, Plaintiffs cannot conclusively determine how many Alabama residents Defendants have represented and upon whom they performed testing. To the extent the Court determines that Plaintiffs have not been successful in establishing personal jurisdiction over the Defendants, Plaintiffs request that the Court allow Plaintiffs to conduct limited jurisdictional discovery. (See Section IV, below).

email sent from Defendants to Plaintiffs and are individuals whom Plaintiffs tested. [Doc. 32, Ex. A at Attachment 4, pp. 1-10] Further, by comparing the partial client list provided by Defendants with the Plaintiffs' testing logs, at least four of the 47 clients disclosed by Defendants are Alabama residents (or at least were tested in Alabama).

Plainly, these additional activities directed at potential and actual Fen-Phen clients in Alabama strengthens a finding of specific personal jurisdiction.

> ### ii.    Defendants have purposefully availed themselves of the privilege of conducting activities in Alabama sufficiently to support a finding of specific jurisdiction.

As detailed above, Defendants' establishment of multiple contractual relationships with two Alabama residents, and the numerous communications and directives Defendants sent to Alabama, are clearly sufficient to establish that Defendants purposefully availed themselves of the privilege of conducting activities in Alabama. *Burger King Corp. v. Rudzewicz,* 471 U. S. at 478-79. As detailed above, Defendants "reached out" beyond the borders of California and established multiple contractual relationships with two parties it knew to be Alabama residents, and received direct benefits from those relationships. Defendants knew that much of Plaintiffs' performance under the original services contract was to be conducted in Alabama and Defendants directed Plaintiffs' performance while in Alabama. Further, the Defendants' representation of Alabama

27

residents in Fen-Phen litigation further demonstrates that Defendants purposefully availed themselves of the privilege of conducting business in Alabama.

### iii.   Defendants should reasonably have anticipated being haled into court in Alabama

Defendants knew that Plaintiffs were both residents of Alabama when they established the separate contractual relationships with Plaintiffs and received the benefits of Plaintiffs' performance.   Based upon this, and the circumstances detailed above, the failure of Defendants to fulfill their contractual and legal obligations to Plaintiffs "caused foreseeable injuries" to Plaintiffs in Alabama.   Thus, "[f]or these reasons it was, at the very least, presumptively reasonable for [Defendants] to be called to account [in Alabama] for such injuries." *Burger King v. Rudzewicz*, 471 U.S. at 480.

Lastly, even if the Court were to reject Plaintiffs' argument that a finding of personal jurisdiction over Hackard & Holt necessarily means a finding of personal jurisdiction over Ted Holt, Ted Holt's own actions sufficiently establish minimum contacts with Alabama.    This Circuit recognizes that a single act directed at a state can be sufficient to satisfy the minimum contacts test, even if that act occurs outside the forum, so long as that act bears a significant relationship to the cause of action. *See, Bigelow-Sanford, Inc. v. Gunny Corp.*, 649 F.2d 1060, 1064 (5th Cir. 1981) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)); *Nat'l Egg Co.*

28

*v. Bank Leumi le-Israel B.M.,* 504 F.Supp. 305, 309-10 (N.D. Ga. 1980) (single telephone conversation sufficient contact where it was crucial to allegations of fraud and misrepresentation).  Ted Holt's single phone call to Mrs. Hoover clearly satisfies this test.  As noted in the Statement of Facts, Mr. Holt called Mrs. Hoover while she was in Birmingham for the sole and express purpose of convincing Mrs. Hoover to continue with her performance.    Mr. Holt informed Mrs. Hoover that he knew she was unhappy, but requested that Plaintiffs still work with Defendants and get Defendants the necessary information they needed so that Fen-Phen cases could proceed.    Mr. Holt represented to Mrs. Hoover that if Plaintiffs continued to work and the cases proceeded to a successful conclusion, that this would be the best way for Plaintiffs to get paid.  In reliance upon Mr. Holt's representations, Plaintiffs continued to perform and incurred an enormous amount of additional expenses from testing and other services which benefited Defendants.  Based upon that, Mr. Holt's single call into the State of Alabama, when considered in context with the other contacts of his law firm, clearly establish minimum contacts with Alabama.

In conclusion, it is clear that Defendants established sufficient "minimum contacts" with Alabama to support the exercise of specific personal jurisdiction over them.

### b.    General Jurisdiction

In addition to finding that Defendants have

established sufficient minimum contacts for the exercise of specific personal jurisdiction, Defendants' systematic and continuous business relations directed at the State of Alabama clearly establishes that this Court has general jurisdiction over Defendants.

In 2002, Defendants established a direct and continuing contractual relationship with Plaintiffs. As is set forth in more detail in the Statement of Facts, over the course of several months in 2002 and 2003, Defendants communicated nearly daily with Plaintiffs regarding Plaintiffs' performance of echocardiogram services on behalf of Defendants, and provided Plaintiffs with specific instructions and directions as to how to accomplish these services on behalf of Defendants. Later, in 2005 and 2006, the Defendants affirmed and ratified the Letter of Understanding through correspondences with Plaintiffs' counsel. During the pendency of this case Defendants have continued to communicate directly with Plaintiffs' counsel, making numerous promises and representations of cooperation. These activities were done by Defendants for their own benefit, *i.e.,* forestall actual litigation so that they could settle as many Fen-Phen cases as possible without paying Plaintiffs. In addition, the Defendants entered into a settlement agreement which specifically names Plaintiff Bridgeway as an intended third party beneficiary. Lastly, it is believed that Defendants have represented numerous Alabama residents in Fen-Phen litigation. Clearly these contacts are the type of

continuous and systematic business relations which entitle the Court to exercise general jurisdiction over Defendants.

Based upon the foregoing, the exercise of general jurisdiction over Defendants would also be appropriate.

### 2. The exercise of personal jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice

It is likewise clear that Defendants have failed to meet their burden of showing that the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice. *Ruiz de Molina v. Merritt*, 207 F.3d at 1358. ("Once it is decided that defendants have at least minimum contacts with a forum, the burden is on the defendants to show that the imposition of jurisdiction in the forum is unreasonable.") The U. S. Supreme Court has stated the following on this subject:

> Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Thus, courts in "appropriate cases" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." . . . ***[W]here a defendant who purposefully has directed his activities at forum residents seeks***

31

> **to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.** Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.

*Burger King Corp. v. Rudzewicz*, 471 U.S. at 476-477 (emphasis added) (citations omitted). The Court in *Burger King* went on to hold that a "State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Id.* at 483. *See also, Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."); *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d at 1358 ("[T]hough defendant objects to the inconvenience of defending in a foreign jurisdiction, a corporation doing business all over the southeast United States may be required to bear that risk."); *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 850 (11th Cir. 1988) ("[A]ny inconvenience caused to [defendants] by subjecting them to the jurisdiction of the Northern District of Georgia is overridden by the greater inconvenience of requiring a Georgia plaintiff, injured in Georgia by the defendants' purposeful activity in and directed at Georgia, to pursue its cause of action in a foreign forum.")

Like the defendants in *Burger King* and *Ruiz de Molina*, Defendants have failed to present any evidence to substantiate its claim that the exercise of jurisdiction by this Court would offend traditional notions of fair play and substantial justice. Defendants, for their own benefit, established multiple contractual relationships with two Alabama residents. Defendants directed communications and directives at Alabama related to Plaintiffs' performance. Further, Defendant Hackard & Holt is a nationwide law firm that seeks out representation of clients throughout the United States, including Alabama. [Exhibit E] Presumably, Defendants are accustomed to traveling throughout the country to try cases. The United States Supreme Court has recognized that even great burdens on a defendant are insufficient to show that the exercise of personal jurisdiction is unreasonable when the action in question is commenced in the plaintiff's home forum. *See, supra, Asahi Metals,* 480 U. S. at 114.

Based upon the foregoing, it is clear that Defendants established sufficient minimum contacts with Alabama to support both specific and general jurisdiction. Further, the exercise of such jurisdiction would not offend traditional notions of fair play and substantial justice. Thus, this Court has personal jurisdiction over Defendants.

### 3.    Defendants Waived Their Right to Assert the Defense of Lack of Personal Jurisdiction.

Due to the Defendants' participation in this litigation and Defendants' delay in filing their motion to dismiss, Defendants waived their right to

33

assert the defense of lack of personal jurisdiction. *See, e.g., Matthews v. Brookstone Stores, Inc.,* 431 F. Supp. 2d 1219, 1222-26 (S.D. Ala. 2006). As noted by the *Matthews* Court, the typical waiver scenario occurs when a personal jurisdiction defense is lost due to a defendant's failure to raise that issue in either a responsive pleading or a Rule 12 motion. *Id.* at 1223. "However, personal jurisdiction may also be waived, even if a defendant has nominally preserved the defense by reciting it in an answer, if that defendant substantially participates in the litigation without actively pursuing its rule 12(b)(2) defense." *Id.* The *Matthews* Court noted that Rule 12(h) merely "sets the outer limits of waiver, without precluding waiver by implication." *Id.* at fn. 4. The Court stated:

> [I]t does not suffice to comport with the letter of Rule 12(h); rather, litigants must adhere to its spirit by pursuing a personal jurisdiction defense in a reasonably prompt fashion "to expedite and simplify proceedings in the federal courts." If a defendant fails to do so, then he may be found to have waived his personal jurisdiction defense, notwithstanding its inclusion in a responsive pleading.

*Id. See, also,* Wright & Miller, 5(C) *Federal Rules of Civil Procedure*, § 1391, Waiver of Certain Defenses – Rule 12(h)(1)  ("[A] party can be held to have waived a defense listed in Rule 12(h)1 through conduct, such as extensive participation in the discovery process or other aspects of the litigation of the case even if the literal requirements of Rule 12(h)(1) have been met … . The result seems to turn on the particular circumstances of an individual case.")  The *Matthews* Court noted two principal considerations when

analyzing a waiver by conduct claim. First, the court must consider the length of time that elapsed between service of process and the defendant's pursuit of a personal jurisdiction defense via rule 12(b)(2) motion. *Id.* at 1224. Second, in addition to the mere passage of time, courts look to the extent of the defendant's involvement in the action prior to raising the defense. *Id.* at 1225.

In the present case, Defendants waited over 10 months from the time they were served with the Verified Complaint to raise the personal jurisdiction defense. In addition, during that time Defendants' substantially participated in these proceedings. The Defendants objected to Plaintiffs' temporary restraining order during the Court's teleconference and it is believed they did not voice any objection to the Court asserting personal jurisdiction over them at that time. In addition, throughout the 10 month period Defendants engaged in informal discovery with Plaintiffs' counsel (*i.e.,* numerous times promised a complete client list, provided a partial list of clients containing 47 names and requested that Plaintiffs provide to Defendants the cost of every test). These facts demonstrate that Defendants waived their right to challenge personal jurisdiction.

## II.    Venue

Although Defendants only conclusively state that venue is improper in Middle District of Alabama, Plaintiffs will briefly address the facts which establish that venue is proper.

### A. Venue is proper because a substantial part of the acts or omissions which give rise to the claims occurred in Montgomery

Pursuant to § 1391(a)(2), venue is proper in the Middle District of

Alabama because a substantial part of the events or omissions giving rise to

the claims occurred within the Middle District. Pursuant to 28 U.S.C.A. §

1391(a):

> A civil action wherein jurisdiction is founded only on
> diversity of citizenship may, except as otherwise
> provided by law, be brought *only in* (1) a judicial
> district where any defendant resides, if all
> defendants reside in the same State, **(2) a judicial
> district in which a substantial part of the
> events or omissions giving rise to the claim
> occurred,** or a substantial part of property that is
> the subject of the action is situated, or (3) a judicial
> district in which any defendant is subject to personal
> jurisdiction at the time the action is commenced, if
> there is no district in which the action may otherwise
> be brought.

(emphasis added). Because all defendants do not reside in the same state,

venue cannot be established under §1391(a)(1). Further, § 1391(2)(3) is

"not applicable [in this case] as it applies to cases which § 1391(a)(1) or §

1391(a)(2) are not applicable." *See, e.g., Sterling v. Provident Life &

Accident Ins. Co.*, ---F. Supp. 2d----, 2007 WL 1789114, \*8 (M.D. Fla. June

19, 2007). "Therefore, any venue in which a substantial part of the events

or omissions giving rise to the claim occurred is a proper venue." *Id.*

In order to determine proper venue under § 1391(a)(2), the court

must consider "the events that give rise to a claim," and of the "places

36

where the events have taken place, only those locations hosting a 'substantial part' of the events will be considered." *Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir.2003). The relevant acts or omissions are those that have a "close nexus to the wrong." *Id.* at 1372. The plaintiff does not have to select the venue with *most substantial* nexus to the dispute, as long as it chooses a venue where a substantial part of the events giving rise to claim occurred. *Morgan v. North MS Medical Center, Inc.,* 403 F. Supp. 2d 1115, 1123 (S.D. Ala. 2005).

Substantial events giving rise to the claims alleged by Plaintiff occurred in Montgomery, Alabama. In *Jenkins Brick,* the Eleventh Circuit provided guidance for what acts or omissions have a close enough nexus to the wrong to constitute "giving rise to a claim" in a breach of contract context.   *Jenkins Brick Co. v. Bremer,* 321 F3d at 1372.   The court considered where the contract was presented, where the contract was executed, where the contract was intended to be performed, and where the contract was breached. *Id.* At least three of the four considerations in the instant case took place in Montgomery.

First, Defendant Todd Lindley, or representatives of his law firm, contacted Ms. Hoover at her office in Montgomery in order to retain Bridgeway to perform echocardiogram testing and screening services for the Defendants and Plaintiff orally agreed to perform such services. [Ex. A, Hoover Aff. at ¶ 3] Also, Ms. Hoover entered into a written contract with

37

Defendant Lindley while in Alabama. [Ex. A, Hoover Aff. at ¶ 3] Likewise, by their actions and acceptance of the benefit of the contract, the other Defendants, including Defendants Holt and Hackard & Holt, ratified and confirmed the contract between Plaintiffs and the other Defendants. A substantial amount of this conduct was initiated by Defendants and purposefully directed at Plaintiffs while Plaintiffs were operating in Montgomery. Throughout the performance of the contract, the Holt Defendants directed dozens of telephone communications and extensive written communications to the Plaintiffs in Montgomery. [Ex. A, Hoover Aff. at ¶ 4] Further, as intended by the contract, Bridgeway performed substantial services under the contract in Montgomery, Troy and Auburn, all of which are within the Middle District. [Ex. A, Hoover Aff. at ¶ 8] All of these events which took place within the Middle District substantially give rise to Plaintiffs' contractual and equitable claims.

Thus, venue is proper under § 1391(a)(2) in the United States District Court for the Middle District of Alabama.

## III. DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN OF ESTABLISHING THAT THEIR MOTION TO DISMISS FOR *FORUM NON CONVENIENS* REASONS SHOULD BE GRANTED

### A. Defendants bear a substantial burden in overturning Plaintiffs' choice of their home forum.

The moving party bears the burden of establishing that a case should be dismissed on the basis of *forum non conveniens*. *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1309 (11th Cir. 1983). "'The plaintiff's choice

of forum should not be disturbed unless it is clearly outweighed by other considerations.'" *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d at 260 (citation omitted). In addition, "plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen [his] home forum." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235 (1981).[15] Further, a defendant's motion to dismiss based on the doctrine of *forum non conveniens* should not be granted if the results of the transfer "would merely shift inconvenience from the defendants to the plaintiff...." *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d at 260.

## B. *Forum non conveniens* analysis

In order to succeed, Defendants must prove the following:  (a) an adequate alternative forum exists, (b) a balance of private interests weigh in favor of transfer, (c) a balance of public interests weigh in favor of transfer and (d) a lack of undue inconvenience or prejudice to the plaintiff. *Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078, 1083 (S. D. Fla. 1997). Even assuming that Defendants can carry their burden of proving that California is an adequate alternative forum, Defendants have not shown that

---

[15]     *See also, Magnin v. Teledyne Continental Motors,* 91 F.3d 1424, 1430 (11th Cir. 1996); *Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078, 1083 (S. D. Fla. 1997) ("Plaintiffs' choice of forum is entitled to a strong presumption of suitability, and defendants must bear the burden of overcoming that presumption by establishing every element necessary to demonstrate *forum non conveniens.*"); *Patel v. Howard Johnson Franchise Systems, Inc.,* 928 F. Supp. 1099, 1101 (M. D. Ala. 1996) (this Court held that "federal courts will accord great deference to the plaintiff's choice of forum if the forum is in the district in which he or she resides.")  *Stewart Organization, Inc. v. Ricoh Corp.,* 696 F. Supp. 583, 588 (N. D. Ala. 1988) ("[I]f the equities only slightly favor a transfer, the plaintiff's choice should not be disturbed.); *Del Monte Fresh Produce Co. v. Dole Food Company, Inc.,* 136 F. Supp. 1271,

39

a weighing of the private and public interests clearly outweigh the deference afforded to Plaintiffs' choice of their home forum.

### 1. Private Interests

The private interests which a court can review in a *forum non conveniens* analysis are as follows: (1) relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing witnesses; and (3) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Banco Latino v. Lopez*, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998). *See also, La Seguridad v. Transytur Line*, 707 F.2d at 1307.

Defendants' argument that the private interests weigh in favor of dismissal is contained in one sentence. On page 10 of Defendants' motion, Defendants assert, without support, that "any evidence and/or witnesses that may be produced by Defendant Holt are located in California under the subpoena power of the California courts." Defendants provide no explanation of what evidence and/or witnesses will have to be procured through subpoena power, nor do they provide any explanation of how that evidence would be relevant to this action. Indeed, presumably, the members of the Hackard & Holt firm would be willing to testify in this matter, and Hackard & Holt will have to produce its own records without the necessity of subpoenas. Other than Hackard & Holt witnesses and

---

1282 (S.D. Fla. 2001) ("[a] court conducting *forum non conveniens* analysis must begin

40

documentation, Defendants have failed to articulate any other evidence and/or witnesses that might exist in California, or that is otherwise beyond the subpoena power of this Court.

A realistic analysis of the private factors clearly demonstrates that Alabama is the more convenient forum. Hackard & Holt is a national law firm that seeks out and represents clients in numerous jurisdictions throughout the United States.[16] [Ex. E] Hackard & Holt lawyers apparently have no problem traveling throughout the country trying cases. By contrast, Plaintiffs have no business contacts with California, and are not accustomed to traveling across the country to try cases. Plaintiffs have chosen their home forum to prosecute their claims, and that choice is entitled to great deference.

## 2.    Public Interests

A list of the public interests which a court could consider in a *forum non conveniens* analysis are as follows: (1) the sovereign's interest in deciding the dispute; (2) the administrative burdens posed by the trial; and (3) the court's application of law with which it is not familiar. *Banco Latino v. Lopez*, 17 F. Supp. 2d at 1333. *See also, Sibaja v. Dow Chemical Co.*, 757 F.2d 1215, 1217 fn. 4 (11th Cir. 1985). First, and most importantly, Alabama has a "'manifest interest' in providing its residents with a

---

with the premise that the plaintiff's choice of forum rarely should be disturbed.")
16      Indeed, the Hackard & Holt client list produced in the Texas litigation show that Hackard & Holt represented Fen-Phen claimants from at least six states. [Doc. 32, Ex. 1 at Attachment 2, pp. APP.0075-APP.0082]

41

convenient forum for redressing injuries inflicted by out-of-state actors."
*Burger King Corp. v. Rudzewicz*, 471 U. S. at 473.    Obviously, this
consideration heavily favors Plaintiffs, who are both Alabama residents who
have been injured in Alabama by Defendants' actions.    Further, Alabama
contract law and equitable principles will apply in this case.    To the extent
any of Plaintiff's claims sound in tort, Alabama recognizes the rule of *lex loci
delicti*, "which means that Alabama courts apply the law of the state where
the injury occurred" with respect to tort actions.    *See Glass v. Southern
Wrecker Sales*, 990 F. Supp. 1344, 1347 (M.D. Ala. 1998).    Plaintiffs were
injured in Alabama.

### 3.    Inconvenience to Plaintiffs

The Court must also consider the inconvenience to Plaintiffs
should this case have to be prosecuted in California.    Unlike Defendants,
Plaintiffs are not used to traveling to foreign jurisdictions to try cases.
Indeed, it would lead to a serious disruption of their lives and professions if
they were required to travel to California to try this case.    Plaintiffs'
documents are maintained in the Middle District of Alabama, and Plaintiffs'
permanent residence is the Middle District of Alabama. It would clearly be of
greater inconvenience to Plaintiffs to try the case in California than on
Defendants to try it in Alabama.    As the Eleventh Circuit has clearly stated,
the district court should not transfer or dismiss a case on *forum non
conveniens* grounds when to do so "would merely shift inconvenience from

42

the defendants to the plaintiff." *Robinson v. Giarmarco and Bill, P.C.,* 74 F.3d at 260.

## IV. PLAINTIFFS SHOULD BE ALLOWED JURISDICTIONAL DISCOVERY BEFORE ANY ADVERSE RULING IS ENTERED.

"Federal courts have generally authorized jurisdictional discovery antecedent to resolving Rule 12(b)(2) motions to dismiss for want of personal jurisdiction." *Matthews v. Brookstone Stores, Inc.*, 431 F. Supp. 2d at 1227 (citations omitted) (district court delayed ruling on defendant's 12(b)(2) motion to dismiss for want of personal jurisdiction until plaintiff was allowed to conduct jurisdictional discovery and file supplemental response). In the present case, Plaintiffs believe that based upon the material submitted with this opposition, they have established that personal jurisdiction exists over Defendants. However, to the extent the Court believes that jurisdiction has not been established, Plaintiffs would request that the Court stay its ruling on Defendants' motion until Plaintiffs can conduct jurisdictional discovery and file supplemental responses. Such jurisdictional discovery would include, but not be limited to, an inquiry into the number of Fen-Phen clients of Defendants which are from Alabama, the number of Alabama residents that Defendants have represented in other litigation, cases in Alabama in which Defendants or their representatives have appeared, marketing efforts of Defendants to obtain clients from Alabama, other appearances in the State of Alabama by Defendants or their representatives, *etc.*

43

## **Conclusion**

Defendants "reached out" from the boundaries of California and established multiple and continuing contractual relationships with Plaintiffs. Defendants knew Plaintiffs were Alabama residents at the time these relationships were established.   Defendants knew that much of the echocardiogram services to be provided by Plaintiffs would be performed in Alabama.  Further, together Ted Holt and other representatives of Hackard & Holt maintained regular contact with Plaintiffs during the course of Plaintiffs' echocardiogram services, including specifically directed Plaintiffs' work for the benefit of Defendants and convincing Plaintiffs to continue to perform under the contract.   These facts alone, much less when considered in relation to the other contacts discussed through this brief, establish that personal jurisdiction exists over the Defendants.

Finally, Defendants have failed to present any substantive argument establishing that venue is improper in this district, nor any evidence demonstrating that California is a more convenient forum.  Plaintiffs, who are Alabama residents, have chosen their home forum in which to pursue this action, which seeks compensation for damages sustained by Plaintiffs in Alabama.   Such choice is entitled to great deference.   Defendants' unsupported allegations concerning the inconvenience of this forum fall woefully short of overcoming the deference given to Plaintiffs' choice of forum.

Respectfully submitted, this the $\underline{18}$ day of January, 2008.

_____

**George L. Beck, Jr. (BEC011)**
**Richard H. Allen (ALL052)**
**Arden Reed Pathak (PAT072)**
Attorneys for Plaintiffs

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
Post Office Box 2069
150 South Perry Street 36104
Montgomery, AL  36102-2069
Telephone: (334) 241-8000
Facsimile:  (334) 323-8888

## **CERTIFICATE OF SERVICE**

A copy of the foregoing has been delivered to the Defendants, at the

addresses set forth below, on this the $\underline{1\Upsilon}$ day of January, 2008.

Todd Lindley, Esq.
8409 Pickwick Lane, Suite 385
Dallas, TX  75225

Theodore J. Holt, Esq.
11335 Gold Express Drive, #105
Gold River, California  95670

HACKARD & HOLT
c/o David Zarka, Esq.
11335 Gold Express Drive, #105
Ancho Cordova, California  95670

Of Counsel

46

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| BRIDGEWAY MOBILE DIAGNOSTICS, LLC, an Alabama Limited Liability Company, and DONNA HOOVER, | * * * * * |
| Plaintiffs, | * * |
| v. | *CASE NO. 2:07-cv-76-WKW * |
| TODD P. LINDLEY d/b/a LINDLEY & ASSOCIATES; THEODORE J. HOLT;HACKARD & HOLT, a Partnership, PHILIP O. WATTS ; WATTS & WATTS, a Partnership ; ALYSTOCK, WITKIN & SASSER, PLC | * * * **CASE UNDER SEAL** * * * |
| Defendants. | * * |

## AFFIDAVIT OF DONNA HOOVER

BEFORE ME, the undersigned authority, personally appeared Donna Hoover, who after being first duly sworn, states as follows:

1.    My name is Donna Hoover.  I am over the age of 21 and have personal knowledge of the facts stated herein. References to "Defendants" in this affidavit refer to Defendants Hackard & Holt and Theodore J. Holt.

**EXHIBIT**

A

2.    I am a citizen of the State of Alabama with my principal primary residence located at 13331 County Road 7, Troy, Alabama.  I temporarily reside in the State of Georgia while my husband participates in a medical residency program.  I intend to return to Alabama after the completion of my husband's medical residency program.   My driver's license and vehicle registration remain with the State of Alabama, I pay taxes in Alabama and I am registered to vote in the State of Alabama.  I am the owner of Bridgeway Mobile Diagnostics, LLC ("Bridgeway").   Bridgeway is an Alabama limited liability company, and at all relevant times its primary place of business was in Montgomery, Alabama.

3.    Some time in January or February, 2002, I was contacted while in Montgomery, Alabama by Defendant Todd Lindley, or representatives of his law firm, about providing echocardiogram testing and screening services in connection with potential clients for Defendant Lindley and other law firms (including Defendants) in potential Fen-Phen litigation.

I orally agreed to perform such services, and later executed a written contract with Defendant Lindley while in Alabama. I had direct communications with Defendants almost from the inception of my work, and Defendants knew that I was in Alabama and that they were going to be receiving the benefits of my services.

4.    It was originally contemplated by the parties that reports and other materials produced by Bridgeway would be sent directly to Defendant Lindley, who would thereafter disseminate the information to Defendants and other national law firms.    However, almost from the very beginning of Bridgeway's performance, Lindley was unable to forward this material to Defendants and the other law firms in a timely or efficient manner.    Due to these logistical problems, within just a few weeks after the execution of the original contract, and thereafter continuing throughout Bridgeway's performance, representatives of Hackard & Holt, including Ted Holt, communicated directly with me while I was in Alabama regarding Bridgeway's performance.    These

communications included dozens of phone calls to Bridgeway's office in Alabama and extensive written communications directed to me in Alabama. Direct communications with Defendants occurred on a nearly daily basis.

5.    I communicated extensively with Hackard & Holt representatives Elisa Zitano, Alisa Holt and Brad McDowell. These representatives of Defendants provided me, while I was in Alabama, specific direction and instructions as to how Bridgeway should perform services for Defendants. Defendants provided me with Defendants' federal express billing number so that Bridgeway could send test results and other material directly to Defendants. I estimate that Bridgeway sent approximately 30 packages containing Plaintiffs' work products directly to Defendants based upon Defendants' instructions. Further, Defendants encouraged Bridgeway to purchase new equipment in order better perform its services. As a result of this request, I contracted to lease and purchase two new ultrasound CYPRESS

machines to more quickly facilitate the testing desired by the Defendants and to produce the tape or documentation requested by Defendants. The acquisition of these two new machines required Bridgeway and I to obligate ourselves to pay $119,000.00. As a result of the failure of Defendnts to pay us as agreed, the machines were foreclosed on, repossessed and a deficiency balance assessed against Bridgeway and I.

6.    At some time around August 2002, Defendants also directed Bridgeway to start preparing separate tapes for Defendants' clients or potential clients. Previously, Bridgeway had put all clients or potential clients (*i.e.,* those for Defendants and Defendant Lindley) on one tape and had forwarded a single report to Lindley. However, pursuant to Defendants' direction, Bridgeway began maintaining separate logs for Defendants' clients or potential clients. Bridgeway would thereafter forward those separate tapes to physicians for readings, and would later forward the separate reports for Defendants' clients or potential clients

directly to Defendants. All of this additional work was done on the instructions of Defendants.

7.    Ted Holt called me while I was in Birmingham some time in September or October 2002. Mr. Holt's call came at a time when I was considering stopping performance under the contract. Mr. Holt attempted to, and in fact did, persuade me to keep performing under the contract. Mr. Holt informed me that he knew I was unhappy, but requested that Bridegway still work with Defendants and get Defendants the necessary information so that the Fen-Phen cases could proceed, and Bridgeway could thereafter receive payment. Mr. Holt represented that if I continued to work and the cases proceeded to a successful conclusion, that this would be the best way for Bridgeway to get paid. In reliance upon Mr. Holt's representations, Bridgeway continued to perform and such performance significantly benefited Defendants.

8.    Both Tammy Brooks and I, on behalf of Bridgeway, generated a log of all testing conducted by

Bridgeway beginning in 2002. These logs have previously been submitted in these proceedings. These logs accurately reflect that Bridgeway tested potential Fen-Phen claimants in six locations in Alabama: Montgomery, Birmingham, Mobile, Bessemer, Troy and Auburn. Bridgeway tested and provided screening services to 226 individuals at these sites in Alabama. I estimate that 60 to 70% of the patients tested in Alabama were for clients or potential clients of Defendants.

9. Bridgeway provided echocardiogram testing and screening services for Defendants from early 2002 through 2003. Although patient testing ended in December 2002, Bridgeway was receiving nearly daily written and verbal requests from Defendants as late as April, 2003 regarding work done directly for Defendants. The Defendants also knowingly benefited from the diagnostic reading services of four Montgomery, Alabama doctors, Drs. Salvia, Garcia, Hastey and Brazil.

This information is true and accurate to the best of my recollection at this time.

_____
DONNA HOOVER

**STATE OF GEORGIA**
**COUNTY OF** _Gwinnett_

    I, the undersigned, a Notary Public, in and for said County in said State, hereby certifies that Donna Hoover, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this day that, being informed of the contents of same, she has executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this _16th_ day of January, 2008.

_____
Notary Public

My commission expires _10/11/2009_

FRANK H. MCFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

J. LIF    HUBBARD
JAM       WALTER, JR.
JAMES  McLEMORE
CONSTANCE SMITH BARKER
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN
M. COURTNEY WILLIAMS

PAIGE R. JACKSON
LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL F. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
### ATTORNEYS AT LAW

August 15, 2006

Theodore J. Holt
Hackard & Holt
11335 Gold Express Drive, #155
Gold River, California  95670

> Re:   Todd Lindley Referrals and Bridgeway Mobile Diagnostics, LLC Lien
>        Our File No.:  25090-0002

Dear Mr. Holt:

You previously indicated that you intended to honor Bridgeway's lien of $1,500.00 per case on every Todd Lindley referral.  I recently learned that you are in litigation with Mr. Lindley over the status of the referrals and referral fees.  Can I assume that you intend to honor Bridgeway's lien on every screen performed by Bridgeway at the rate of $1,500.00 per client?  If not, I will have to file a separate lawsuit here in Alabama or intervene in the Texas lawsuit.  Please let me know everyone's intentions.

Incidentally, I would like to receive an inventory of cases purported to be referred to you by Todd Lindley, whether any funds have been received and the date of receipt.  I look forward to hearing from you.

Sincerely,

CAPELL & HOWARD, P.C.

George L. Beck, Jr.

GLB,JR:cmj

cc:   Jack B. Krona, Jr., Esq.
      Todd Lindley, Esq., Lindley & Associates
      Donna and Jason Hoover c/o Bridgeway Mobile Diagnostics, LLC

**EXHIBIT**

B

MONTGOMERY • OPELIKA / AUBURN

1073954.doc60 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 tel     334 323 8888 fax     www.capellhoward.com

FRANK H. McFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

J. LISTER HUBBARD
JAMES N. WALTER, JR.
JAMES H. McLEMORE
CONSTANCE SMITH BARKER
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN
M. COURTNEY WILLIAMS

LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL P. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TODD H. COX
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
ATTORNEYS AT LAW

December 19, 2006

Theodore J. Holt
Hackard & Holt
11335 Gold Express Drive, #155
Gold River, California 95670

     Re:   ***Bridgeway Mobile Diagnostics, LLC***
           ***Todd Lindley Phen-Fen referral cases***
           ***Our File No.: 25090-002***

Dear Mr. Holt:

     On separate occasions, you promised to protect Bridgeway Mobile Diagnostics, LLC with regard to their expenses incurred on clients referred to you by Todd Lindley in Phen-Fen cases. My law firm forebear from filing suit against Mr. Lindley and including your firms in the lawsuit because of those commitments. I understand that some of your clients have already received their distribution from Phen-Fen cases. However, Bridgeway has not received their expenses.

     I have written numerous letters and left several telephone messages with you and your staff. However, I have received no word as to why no payments have been forthcoming. Please contact me with a full explanation.

     Sincerely,

     CAPELL & HOWARD, P.C.

     George L. Beck, Jr.

GLB,JR/mm
cc:   Todd Lindley
      Jack B. Krona, Jr.
      Donna Hoover

MONTGOMERY · OPELIKA / AUBURN

1082186  150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 tel     334 323 8888 fax     www.capellhoward.com

**Richard H. Allen**

| | |
|---|---|
| **From:** | Richard H. Allen |
| **Sent:** | Monday, June 18, 2007 1:53 PM |
| **To:** | 'dzarka@hackardlaw.com' |
| **Cc:** | George L. Beck, Jr. |
| **Subject:** | Bridgeway |

Dave:

I'm glad we had a chance to speak last week. As promised, I'm attaching a copy of the transcript from the hearing in *Lindley v. Hackard & Holt* in which the parties read into the record, and the court adopted as an order, the parties' settlement. As I mentioned to you, Item fourteen (page 9) reads as follows:

> Fourteen, in cases where Bridgeway performed the echocardiogram, they will be paid per the agreement with Bridgway or subsequent modification of the agreement with Bridgeway.

As a third-party beneficiary to this agreement and order of the court, we believe we are entitled to full payment from Hackard & Holt and Lindley of the amount due under the parties' previous settlement agreement (i.e., no less than $1500 per relevant client).

I will discuss with George your request that our client provide you the actual cost for each test. However, we will first need Hackard & Holt's list of relevant clients (which is long overdue) before considering this request for additional information.



Transcript.pdf (1 MB)

Richard H. Allen

Capell & Howard, P.C.
150 South Perry Street (36104)
Post Office Box 2069 (36102-2069)
Montgomery, Alabama
Direct Phone:   (334) 241-8019
Direct Facsimile: (334) 241-8219
E-mail:    rha@chlaw.com
Website:   www.capellhoward.com

*Confidentiality Notice: This electronic communication is from a law firm and may be protected either by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please immediately notify the sender by reply e-mail or by telephone at (334) 241-8019, and delete this from your computer. In addition, an unintended recipient should not print, copy, retransmit, disseminate, or otherwise use any information contained in this communication. Thank you.*

EXHIBIT

C

**Richard H. Allen**

| | |
|---|---|
| **From:** | Richard H. Allen |
| **Sent:** | Sunday, August 19, 2007 4:09 PM |
| **To:** | 'd.zarka@hackardlaw.com' |
| **Subject:** | Bridgeway v. Lindley; Hackard & Holt |

**Importance:**    High

David:

      In June you ask Bridgeway to provide you the actual cost for tests performed on Hackard & Holt clients. My understanding was that you needed this information in order to disclose it on the settlement sheets. As I mentioned to you, my client cannot and will not provide that information until we receive from you an accurate list of your clients upon whom Bridgeway performed testing. We have requested this list, and your firm has promised this list, numerous times. To date, all we have received is the first page of an exhibit attached to Todd Lindley's letter dated May 2, 2005 (containing the names of 47 Hackard & Holt clients).

      Once again, please provide us a list of all Hackard & Holt phen-fen clients referred to it by Lindley and/or upon whom Bridgeway performed testing. After I receive this list I can have my client prepare the actual cost compilation that you requested.

Richard H. Allen

Capell & Howard, P.C.
150 South Perry Street  (36104)
Post Office Box 2069  (36102-2069)
Montgomery, Alabama
Direct Phone:   (334) 241-8019
Direct Facsimile: (334) 241-8219
E-mail:    rha@chlaw.com
Website:   www.capellhoward.com

*Confidentiality Notice: This electronic communication is from a law firm and may be protected either by the attorney-client privilege, as attorney work-product or by virtue of other privileges or provisions of law. If you are not an intended recipient, please immediately notify the sender by reply e-mail or by telephone at (334) 241-8019, and delete this from your computer. In addition, an unintended recipient should not print, copy, retransmit, disseminate, or otherwise use any information contained in this communication. Thank you.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TODD LINDLEY, and | § | |
| LINDLEY & ASSOCIATES, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:05-CV-1476-L |
| | § | |
| HACKARD & HOLT, | § | |
| MICHAEL A. HACKARD, and | § | |
| THEODORE J. HOLT, Individually, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION TO:

### (1) RE-OPEN THIS CASE,

### (2) APPOINT A DALLAS RECEIVER OVER THE FEN-PHEN PROCEEDS OR A DALLAS SETTLEMENT SPECIAL MASTER,

### AND

### (3) ENFORCE THE MAY 4, 2007 SETTLEMENT AGREEMENT

#### I. Introduction

Hackard & Holt continues to steal from Lindley & Associates and to throw up road block after road block to being held accountable. Despite agreeing on May 4, 2007 to provide Lindley & Associates with access to its files and all information on the Fen-Phen cases that Lindley & Associates referred to Hackard & Holt as well as all the other cases and to pay Lindley & Associates 38.5 percent in referral fees, Hackard & Holt has provided virtually no meaningful information and no money since May 4. Instead, it has admitted that it stole over $730,000 of Lindley & Associates' fees in cases that had settled before May 4 and it has continued to stonewall on providing information or money. On Friday, November 16, Hackard & Holt

**EXHIBIT**

tabbies

D

announced that it will no longer honor the settlement agreement and that it refuses to pay any fees to Lindley & Associates (Tab 18). In light of this announced or anticipatory breach, Lindley & Associates now asks this Court to re-open the case, appoint a Dallas receiver for Hackard & Holt or a Dallas special master for the May 4 settlement, and enforce the May 4 settlement without further delay and expense to Hackard & Holt's victim—Lindley & Associates.

## II. Background

### A.    Lindley & Associates referred over 1,100 Fen-Phen cases to Hackard & Holt.

Between October 2001 and June 2003, Plaintiffs Lindley & Associates, P.C., and Todd Lindley (collectively "Lindley & Associates") referred at least 1,074 diet-drug, or Fen-Phen,[1] cases to Defendants Hackard & Holt, Michael A. Hackard, and Theodore J. Holt (collectively "Hackard & Holt") for litigation.[2]    Hackard & Holt either filed the cases against the drug company, Wyeth, or submitted the claims to the AHP Settlement Trust for resolution under class-action orders.[3] Breaching its agreement to litigate the cases, Hackard & Holt also referred some of the cases on to other lawyers for litigation.

Other lawyers, in addition to Lindley & Associates, referred Fen-Phen cases to Hackard & Holt as well. Hackard & Holt promised to keep the referring attorneys informed about the status of the cases by allowing them access to a database called "Upshot."[4]

---

[1] For background information on Fen-Phen litigation, see *In re Diet Drugs*, 369 F.3d 293 (3d Cir. 2004).

[2] *See* Declaration of David E. Smith, ¶ 16 (signed Feb. 21, 2007), Tab 7, App. 66.

[3] *See Brown v. Am. Home Prods. Corp.*, MDL 1203, Civ. A. No. 99-20593, 2000 U.S. Dist. LEXIS 12275, *4-18, 26-51 (E.D. Pa. Aug. 28, 2000) (certifying a class); *Brown v. American Home Prods. Corp.*, 226 F.R.D. 498 (E.D. Pa. 2005) (recounting a history of the litigation).

[4] *See* Smith Declaration, ¶ 9, Tab 7, App. 64.

**B.     Hackard & Holt cut referring attorneys off from case information.**

Despite its promise, Hackard & Holt shut its referring attorneys out of the Upshot database in early 2004.[5]   It also refused to provide referring attorneys information by other means, despite their repeated requests.[6]

**C.     Lindley & Associates sued Hackard & Holt for breach of the referral agreement.**

In 2002, Hackard & Holt settled Judith Olson's opt-out case with Wyeth.  It paid Lindley & Associates the referral fee in *Olson* in May 2002 under the referral contract.

In 2005, however, Hackard & Holt settled Susan Ralph's opt-out case as well.  But this time it refused to inform Lindley & Associates of this fact or to pay the referral fee.  When Lindley & Associates discovered its wrongdoing, it sued Hackard & Holt in this Court on June 16, 2005.  In November 2005, this Court ordered Hackard & Holt to deposit Lindley & Associates' referral fee in *Ralph* in a trust account. [7]

Nonetheless, in early Spring 2005, Hackard & Holt stopped forwarding Lindley & Associates and other referring attorneys their shares of the attorney's fees and generally stopped providing meaningful information about the status of other cases.  At least two other firms are, thus, suing Hackard & Holt.

**D.     The $33.5 Million Global Settlement with Wyeth**

In November 2006, Hackard & Holt reached a $33.5 million global settlement "in principle" with Wyeth in 575 of Hackard & Holt's cases against Wyeth that had either opted out

---

[5] *See* Smith Declaration ¶ 22, Tab 7, App. 68.

[6] *See id.* ¶ 22, Tab 7, App. 68.

[7] *See* Agreed Order Granting Plaintiffs' Motion for an Accounting and an Order to Deposit Disputed Funds (filed Nov. 10, 2005), Tab 8, App. 70-71.

of the class action ("opt-out" cases) or were originally excluded from the class action ("PPH cases").[8] Lindley & Associates referred approximately 282 of these cases to Hackard & Holt.

### E.    Hackard & Holt capitulated to Lindley & Associates.

Knowing that a jury would soon hear about its theft and other wrongdoing, Hackard & Holt capitulated to Lindley & Associates and settled this case at the May 4, 2007 pretrial conference. The parties read their settlement agreement into the record, and the Court made the agreement its own order.[9] The Court also administratively closed the case.[10] The parties agreed to appoint a special master, and, among other things, Hackard & Holt agreed to disclose all information and pay 38.5 percent of the total attorney's fees to Lindley & Associates as a referral fee.[11]

### F.    The Post-May 4 Settlement Process:    Hackard & Holt admits to theft and stonewalls.

On August 21, 2007, the Court appointed Richard L. Gilbert, Judge of the Superior Court, retired, with offices at 2630 "J" Street, Sacramento, California, to serve as the Special Master over the settlement process.[12]

On September 4, 2007, the Special Master issued Special Master's Order Number One Regarding the Process to Effectuate Settlement (Tab 9). He directed Hackard & Holt to provide

---

[8] See Letter of Anand Agneshwar, Wyeth's counsel, to the Hon. Jonathan Harris, Superior Court of New Jersey, 1 (May 23, 2007), Tab 3, app. 26-27.

[9] See Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 22, in Lindley v. Hackard & Holt, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1, App. 22.

[10] See Order (filed May 4, 2007), Tab 2, App. 25.

[11] See Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 6, 8-9, in Lindley v. Hackard & Holt, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1, App. 6,8,9.

[12] See Order Regarding the Appointment of Special Master; Jurisdiction, Duties and Powers of the Special Master (filed Aug. 21, 2007), Tab 6, App. 34-62.

---

certain information, including the status and location of the funds that it had misappropriated from Lindley & Associates both before and after May 4.[13]  He also set up a procedure by which the parties could submit disputes to him for resolution.[14]

On September 10, the Special Master issued Special Master's Order Number Two Regarding the Process to Effectuate Settlement and directed the parties to exchange certain information and attend a conference in his Sacramento offices on September 11.[15]

On September 11, the parties met in the Special Master's Sacramento offices to discuss Lindley & Associates' audit rights against Hackard & Holt and the mechanics of Hackard & Holt repaying Lindley & Associates both the money it had stolen in the past and the referral fees on cases that settled in the future (chiefly in the $33.5 million global settlement).  During the meeting, Hackard & Holt acknowledged that they had stolen over $730,000 of Lindley & Associates' fees before May 4, 2007.

As one item of information, Lindley & Associates asked for a copy of the master settlement agreement that governed the $33.5 million global settlement with Wyeth.  Asserting that the master agreement was "confidential," Hackard & Holt threw up a roadblock and insisted that Lindley & Associates and its attorneys sign a confidentiality "agreement" that imposes duties solely on Lindley & Associates and its lawyers and provides benefits solely to Ted Holt.  Lindley & Associates argued that this Court's Stipulation and Protective Order should apply if the master agreement is truly confidential.[16]  When the parties could not agree, Lindley &

---

[13] *See* Special Master's Order Number One Regarding the Process to Effectuate Settlement, ¶7(p)(signed Sept. 4, 2007), Tab 9 ("Order no. 1"), app. 75.

[14] *See id.* ¶13, Tab 9, App. 78-79.

[15] *See* Special Master's Order Number Two Regarding the Process to Effectuate Settlement (signed Sept. 4, 2007), Tab 10, App. 81-84.

[16] *See* Letter from Michael Pezzulli to Judge Richard Gilbert, 1-2 (Sept. 17, 2007), Tab 11, App. 85-102.

Associates submitted the issue to the Special Master under the dispute-resolution procedure on September 17.[17] To date, the Special Master hasn't ruled. And although James Sokolve, another attorney who referred cases to Hackard & Holt, signed the firm's requested confidentiality agreement, Hackard & Holt has nonetheless refused to produce the master agreement to him either.

## G. Lindley & Associates—and other referring lawyers—filed liens with Wyeth and the AHP Settlement Trust.

On September 27 and October 15, Lindley & Associates submitted liens on the Fen-Phen settlement proceeds to Wyeth and the AHP Settlement Trust to protect its interests, especially in the $33.5 million global settlement.[18] Other attorneys who referred Fen-Phen cases to Hackard & Holt have filed similar liens.

## H. The Special Master's proposed Order No. 3 would re-draft the May 4 settlement agreement.

Between November 5 and 6, Hackard & Holt wrote a series of emails to the Special Master, complaining that Lindley & Associates' liens would unduly hold up completion of the $33.5 million global settlement.[19] For whatever reason, however, Hackard & Holt failed to inform the Special Master about the other attorneys' liens on the exact same cases and pending settlements. It, thus, tried to create the false impression that Lindley & Associates' liens alone presented some unique obstacle to the settlement rather than Hackard & Holt's misconduct.

---

[17] *See id.*, Tab 11, App. 85-90.

[18] *See* Letters at Tab 12, App. 103-109.

[19] *See e.g.*, Email from Peter Holt to Judge Richard Gilbert, 1 (Nov. 5, 2007), Tab 14., App. 113.

On November 6, Lindley & Associates sent a letter, which outlined the information that it is entitled to under the May 4 settlement and several issues raised by Hackard & Holt's continued attempts to stonewall.[20]

On November 10, one of the individual defendants, Michael Hackard, complained that Lindley & Associates' insistence on its rights was nothing more than "trying to count fleas in the hair of a dog."[21]

On Thursday, November 15, the Special Master proposed to issue a third order to govern the settlement process (Tab 17). With all due respect to the Special Master and his attempt to treat the parties fairly evenhandedly, the order doesn't treat Hackard & Holt as the problem—as the party who has admitted that it stole over $730,000 from Lindley & Associates—and Lindley & Associates as the victim with a binding settlement agreement. The process of enforcing the May 4 settlement agreement is the *end* of a long litigation, not the beginning. It's not time to entertain more roadblocks from Hackard & Holt. It's time to enforce Lindley & Associates' rights. Proposed order no. 3 would suddenly drop the requirement for Hackard & Holt to produce the master settlement agreement, which governs the $33.5 million global settlement, and ignore Lindley & Associates' request for a ruling on the dispute over a confidentiality order. It would again delay Hackard & Holt's production of information. It would appoint a Sacramento accounting firm to oversee the settlement money, reimbursements of costs, and payment of claims, as well as to audit various aspects of the process—and require Lindley & Associates to *pay* half the costs—even though the May 4 settlement agreement contemplates no such appointment. Not only that, but order no. 3 would appoint an accounting firm that has worked

---

[20] *See* Letter from Michael Pezzulli to Peter Holt and Michael Hackard (Nov. 6, 2007), Tab 15, App. 116-120.

[21] *See* Email from Michael Hackard to Judge Gilbert, 1 (Nov. 10, 2007), Tab 16, App. 121.

with Hackard & Holt 17 times in the past, although it has also worked for attorneys who were adverse to Hackard & Holt, including a malpractice case against it.[22]  Proposed order no. 3 would also allow Hackard & Holt to try to recover 50 percent of its echocardiogram costs from Lindley & Associates despite the May 4 settlement agreement's language to the contrary, which governs this issue.  Proposed order no. 3 has other problems, but these illustrate the point.

**H.      Hackard & Holt announces that will no longer honor the May 4 settlement.**

After Central Standard business hours on Friday, November 16, Hackard & Holt wrote that it will not pay any of the monies that it owes to Lindley & Associates under the May 4 settlement agreement.[23]  It argues that California and Texas rules against sharing attorney's fees with non-lawyers prevent it from honoring its commitments.  It argued substantially the same thing during the main litigation in this case and agreed in the May 4 settlement agreement that Lindley & Associates already performed all duties and met all obligations to entitle it to fees and that no portion of Lindley & Associates' money belonged to Hackard & Holt (yes, Hackard & Holt now purports to want to protect money from the party whom it already admitted is its true owner).

---

[22] *See* Special Master's Order Number Three Regarding the Process to Effectuate Settlement, ¶¶ 2-4 (proposed Nov. 16, 2007), Tab 17, App. 127-29 ([T]he Special Master Orders that Ueltzen & Company, LLP, 3600 American River Drive, Suite 150, Sacramento, CA 95864 is appointed as 'Supervising Accountant' . . . ."); Email from Richard Gilbert to Ted Holt, et al. 1-3 (Nov. 15, 2007), Tab 17, app. 123-24.

[23] *See* Letter from Peter Holt to Michael Pezzulli, 1, 4 (Nov. 16, 2007), Tab 18, App. 140-49.

### III. Standards

First, the Court has the inherent power to re-open an administratively closed case.[24]

Second, the Court may appoint a receiver for Hackard & Holt or the Fen-Phen cases in Dallas under Rule 66. Alternatively, it has the inherent power to appoint a special master in Dallas to oversee actual enforcement of the May 4 settlement agreement.

Third, it has the power under both the May 4 settlement agreement itself, which is the Court's order, and the All Writs Act to enforce the May 4 agreement.

### IV. The Court should re-open this case.

Hackard & Holt has no intention of meeting its obligations under the May 4 settlement agreement. But the agreement is the Court's order. Thus, the Court should re-open the case and force Hackard & Holt to comply.

### V. The Court should appoint a Dallas receiver or Special Master.

Hackard & Holt continues to stonewall on both information and money and will continue to do so as long as the proceeding is in its back yard. Now, the Special Master's proposed order no. 3 would add a Sacramento accounting firm to the process. So far the Special Master has ordered the parties to fly to attend the one face-to-face meeting in Sacramento and now proposes to order the parties to attend another one in Sacramento on December 10. But Hackard & Holt has stolen Lindley & Associates' money and it has virtually all of the relevant information. Hackard & Holt owes Lindley & Associates a full accounting of the Fen-Phen litigation, cases, settlements, and a full accounting of *all* the money—at Hackard & Holt's full expense. This isn't a two-way street. Hackard & Holt alone owes all the information and money to Lindley & Associates.

---

[24] *See Oyuela v. Seacor Marine, Inc.*, No. 05-30779, 2006 U.S. App. LEXIS 24685, *2-3 (5th Cir. Oct. 3, 2006); *Macklin v. City of New Orleans*, 293 F.3d 237, 240 (5th Cir. 2002).

## VI. The Court should enforce the May 4 settlement agreement.

**A.    General**

The Court adopted the May 4, 2007 settlement agreement as its own order.[25]  At bottom,

it requires Hackard & Holt to fully disclose all relevant information and to fully pay Lindley &

Associates 38.5 percent of the attorney's fees in the Fen-Phen cases that Lindley & Associates

referred to Hackard & Holt. Nonetheless, Peter Holt announced on November 16 that Hackard

& Holt has no intention of following the Court's May 4 order. Thus, this Court should enforce

its order and hold Hackard & Holt in contempt if necessary.

**B.    Some Specifics**

**1.    Lindley & Associates' liens should remain in place.**

In September and October 2007, Lindley & Associates sent the lien notices at Tab 12 to

the attorneys for Wyeth and the AHP Settlement Trust. These liens are the only leverage that

Lindley & Associates has against Hackard & Holt. In fact, before the May 4 settlement, Hackard

& Holt stole over $730,000 of Lindley & Associates share of the Fen-Phen settlement proceeds.

And it hasn't repaid a dime. Nonetheless, the Special Master's proposed order no. 3 would lift

Lindley & Associates' liens.[26]  It would also give the Special Master the power to make

payments to Hackard & Holt—regardless of whether the firm first met its obligations to Lindley

& Associates.[27]  But stripping Lindley & Associates of its only leverage without confirmation

that Hackard & Holt has fully discharged all of its duties of full disclosure and full payment to

---

[25] *See* Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 22, *in Lindley v. Hackard & Holt*, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1, App. 22.

[26] *See, e.g.*, Special Master's Order Number Three Regarding the Process to Effectuate Settlement, ¶ 18 (proposed Nov. 15, 2007), Tab 17, App. 135-36.

[27] *See id.* ¶ 2(a) & n.4, Tab 17, App. 128.

Lindley & Associates is outside the May 4 settlement agreement. Lindley & Associates' liens should remain under its control.

### 2.      The Court should require Hackard & Holt to make full disclosure.

In the May 4 settlement, Hackard & Holt agreed to give "full disclosure and full right of access to a representative of Lindley & Associates to Hackard & Holt's files and all information [at] Hackard & Holt on all Lindley & Associates' cases, including access to information and allocation for all [575] opt-out cases in the $33.5 million opt-out settlement."[28] Thus, the settlement agreement, which is an order of this Court,[29] requires Hackard & Holt to make full disclosure of all relevant information. As a practical matter, the Court should order Hackard & Holt to do at least three things to ensure full disclosure—although this list isn't exhaustive.

#### a.      It should require Hackard & Holt to swear to an accurate case list.

The Court should require Hackard & Holt to review a list of potential cases or clients that Lindley & Associates sent to Hackard & Holt and verify, under oath, whether or not Hackard & Holt accepted the case or client and filed a lawsuit or a claim with the AHP Settlement Trust (or whether it referred the case to another lawyer for litigation). During the parties' referral relationship, Lindley & Associates sent over 2,000 potential cases or clients to Hackard & Holt for review. Hackard & Holt ultimately accepted over 1,074 of these, which the parties now refer to as the "referred" cases; that is, the universe of cases subject to the May 4 settlement. It also rejected some of the cases. But only Hackard & Holt has full access to this information. Thus, the Court should require Hackard & Holt to review a list of potential cases or clients that Lindley

---

[28] Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 6, *in Lindley v. Hackard & Holt*, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1, App. 6.

[29] *See id.* at 22, Tab 1, App. 22.

& Associates sent over and then confirm, under oath, whether the case is subject to the May 4 settlement. For each case that Hackard & Holt contends that it rejected, the Court should require Hackard & Holt to produce a turn-back or rejection letter.

### b.    It should require Hackard & Holt to disclose all 575 client names.

The Court should require Hackard & Holt to disclose all 575 client names, settlement terms and amounts, and allocations of proceeds to clients in all cases covered by the $33.5 million global opt-out settlement. Lindley & Associates referred at least 282 of these cases to Hackard & Holt. Now, however, Hackard & Holt has purported to allocate the $33.5 million in settlement proceeds over all the clients and to calculate that it owes Lindley & Associates approximately $2 million in fees. But assuming that Lindley & Associates referred cases that statistically were as valuable as other referrals, then Lindley & Associates' share of the $33.5 million should be over $3 million. The only way to check Hackard & Holt's allocation is to order it to produce the names of all 575 clients and supporting medical records in the opt-out settlement and the allocation of funds to all the clients. Again, Lindley & Associates has the right to "information and allocation for all [575] opt-out cases in the $33.5 million opt-out settlement."[30]  Hackard & Holt still refuses to provide this information to cover up its malfeasance.

### c.    It should require Hackard & Holt to provide an audit trail on where all of Lindley & Associates' money has gone.

Many of the Fen-Phen cases that Lindley & Associates referred to Hackard & Holt have settled. In fact, many settled before the May 4 settlement here. Despite Lindley & Associates' repeated requests in letters and discovery and this Court's order, Hackard & Holt refused to

---

[30] Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 6, *in Lindley v. Hackard & Holt*, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1.

provide this information during the litigation.[31]  In the May 4 agreement, Lindley & Associates agreed that Hackard & Holt could repay Lindley & Associates for its share of the settlement proceeds that Hackard & Holt had misappropriated before May 4 from Lindley & Associates' share of the $33.5 million global opt-out settlement. But Lindley & Associates also insisted on full disclosure of the information about where the money went. In fact the Special Master recognized that in paragraph 7(p) of his order no. 1 and again would recognize it in paragraph 15(p) his proposed order no. 3. Without this information, which Hackard & Holt is withholding, no one can calculate how much Hackard & Holt owes. This Court should continue to order this as part of enforcing the May 4 settlement.

**3.    The Court should require Hackard & Holt to make full payment.**

Hackard & Holt also agreed to pay Lindley & Associates 38.5 percent of the attorney's fees on the Fen-Phen settlements, regardless of when those cases settle (before or after May 4, 2007).[32]  The Court should order Hackard & Holt to fully pay Lindley & Associates as part of enforcing its May 4 order. The Court should declare void all of Hackard & Holt's assertions as to why it now does not have to pay, including its latest ones in Peter Holt's November 16 letter at Tab 18. Hackard & Holt will continue to stonewall without an order.

Moreover, Hackard & Holt's obligation to fully pay Lindley & Associates involves at least two other aspects: (a) fully repaying Lindley & Associates for its theft of Lindley & Associates' share of settlement proceeds on cases that settled before May 4, 2007 (at least $730,000) and (b) assessing Hackard & Holt's allocation of funds, particularly in the $33.5

---

[31] *Compare* Declaration of Todd P. Lindley, ¶¶ 3-8 (signed Mar. 12, 2007), Tab 4, App. 28-29 *with* Letter from Peter Holt to Jack Krona, 1-2 (Mar. 26, 2007), Tab 5, App. 31-32.

[32] *See* Reporter's Transcript of Proceedings Had on Friday, May 4, 2007 Pretrial Conference Hearing Before the Honorable Sam A. Lindsay, Judge Presiding, 8-9, *in Lindley v. Hackard & Holt*, Case No. 3:05-CV-1476-L (N.D. Tex. May 4, 2007), Tab 1, App. 8-9.

million global opt-out settlement, between clients and adjusting for improper allocations (that is, the failure to treat like cases alike). Point (a) will require holding back, or maintaining a lien on, enough of the settlement proceeds—for example, the $33.5 million opt-out proceeds—to not only pay Lindley & Associates its share of those proceeds but also enough to re-pay Lindley & Associates for Hackard & Holt's misappropriation of proceeds before and after May 4 (Hackard & Holt has forwarded no proceeds on cases that have settled after May 4 either). Point (b) will require holding back, or maintaining a lien on, enough of the settlement proceeds to permit Lindley & Associates to exercise its rights to full access to information under the May 4 agreement and then to make a claim against Hackard & Holt for improperly allocating settlement proceeds to clients who were referred by lawyers with lower referral fees. Lastly, the Court should require Hackard & Holt to pay interest on the fees it has improperly withheld, including the $730,000. In short, Hackard & Holt fully paying Lindley & Associates will not be a matter of simple math.

### 4.    The Court should require Hackard & Holt to pay the full costs of its compliance.

Hackard & Holt has, or had, hundreds of thousands of Lindley & Associates' money in its possession. It, thus, owed Lindley & Associates fiduciary duties to fully account for that money and to fully pay it to Lindley & Associates. Nonetheless, the Special Master's proposed order no. 3 would require Lindley & Associates—as the principal in this fiduciary relationship—to pay one-half of the costs for Hackard & Holt—as the fiduciary—to account for what it did with the money and to pay it over to Lindley & Associates. This Court should reject this proposed addition to fiduciary law and direct the Special Master—or a new Special Maser—to require Hackard & Holt to fully bear the costs of making the disclosures that a fiduciary owes to its principal with regards to the principal's money in its possession.

5.    **The Court should require Hackard & Holt to pay Lindley & Associates'
attorney's fees and costs.**

Hackard & Holt's continued war of attrition also improperly increases Lindley &

Associates' attorney's fees and costs. But, again as the fiduciary here, Hackard & Holt should

bear all the costs of fully disclosing all relevant information to Lindley & Associates and fully

repaying all monies it owes to Lindley & Associates under the May 4 settlement—including

Lindley & Associates' attorney's fees and costs created by Hackard & Holt's misconduct.

6.    **The Court should bar a new deal on echocardiogram costs.**

Pages 8–9 of the May 4 settlement agreement sets out how Hackard & Holt and Lindley

& Associates are to recover costs incurred in preparing the Fen-Phen cases, including

echocardiogram costs. Essentially, the underlying client contracts will govern whether either law

firm may seek reimbursement from the client's share of the settlement proceeds. Otherwise,

each firm shall bear its own costs. Nonetheless, in the post-May 4 process, Hackard & Holt has

argued that Lindley & Associates should suddenly pay one-half Hackard & Holt's costs. But for

whatever reason, Hackard & Holt doesn't think that it should bear one-half of Lindley &

Associates' costs. In reality, this is simply another roadblock. But the Special Master's

proposed order no. 3 would allow Hackard & Holt to continue to assert its new cost claim.[33]

This Court should enforce the May 4 settlement agreement and bar this or any other claim.

### VII. Conclusion and Prayer for Relief

Hackard & Holt has stolen over $730,000 of Lindley & Associates' money and it now

owes fiduciary duties to fully account for the money, disclose full information about the Fen-

Phen settlements, and fully pay Lindley & Associates. To properly enforce the Court's May 4

---

[33] *See, e.g.*, Special Master's Order Number Three Regarding the Process to Effectuate Settlement, ¶¶ 2(d), 4
(proposed Nov. 15, 2007), Tab 17, App. 128, 129.

settlement agreement/order, several things should happen: (1) Lindley & Associates' liens should remain in place; (2) the Court should require Hackard & Holt to make full disclosure (including swearing to an accurate case list; disclosing the 575 client names, terms, and amounts in the $33.5 million opt-out settlement (as well as the master settlement agreement itself); and providing an audit trail on the money, including the $730,000); (3) the Court should require Hackard & Holt to make full payment (that is, to pay Lindley & Associates all the proper money, repay the $730,000 misappropriation, and pay any amounts due as a result of improperly allocating settlement proceeds to clients who were referred by lawyers with lower referral fees); (4) the Court should require Hackard & Holt to pay the full costs of its compliance; (5) the Court should require Hackard & Holt to pay Lindley & Associates' attorney's fees and costs incurred in this process of enforcing the May 4 agreement; and (6) the Court should bar all new claims or attempts to reapportion the costs the firms incurred in preparing the underlying Fen-Phen cases.

Respectfully submitted,

PEZZULLI KINSER, L.L.P.

By: /s/ Michael F. Pezzulli
    Michael F. Pezzulli
    State Bar No. 15881900
    Jack B. Krona, Jr.
    State Bar No. 24005304
    Christopher L. Barnes
    State Bar No. 00792175
    17304 Preston Road, Suite 700
    Dallas, Texas  75252
    972.713.1300
    972.713.1333  fax
    ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF CONFERENCE

Counsel for the parties conferred on Monday, November 19, 2007, during a conference call with the Special Master Richard L. Gilbert, Judge.  Hackard & Holt, Theodore Holt, and Michael Hackard oppose this motion.

/s/ Michael F. Pezzulli
Michael F. Pezzulli

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served via ECF upon Defendants, Hackard & Holt and Theodore Holt, 11335 Gold Express Drive, Suite 105, Gold River, California 95670, and on Defendant, Michael Hackard, 3600American River Drive, Suite 215, Sacramento, CA, 95864, on November 19, 2007.

/s/ Michael F. Pezzulli
Michael F. Pezzulli

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TODD LINDLEY, and<br>LINDLEY & ASSOCIATES, | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | CIVIL ACTION NO. 3:05-CV-1476-L |
| HACKARD & HOLT,<br>MICHAEL A. HACKARD, and<br>THEODORE J. HOLT, Individually, | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

## APPENDIX TO PLAINTIFFS' MOTION TO:

### (1) RE-OPEN THIS CASE,

### (2) APPOINT A DALLAS RECEIVER OVER THE FEN-PHEN PROCEEDS OR A DALLAS SETTLEMENT SPECIAL MASTER,

### AND

### (3) ENFORCE THE MAY 4, 2007 SETTLEMENT AGREEMENT

| | | |
|---|---|---|
| 1. | Reporter's Transcript | App. 001-0024 |
| 2. | 05/04/07 Order | App. 0025 |
| 3. | 05/23/07 Correspondence | App. 0026-0027 |
| 4. | Declaration of Todd P. Lindley | App. 0028-0030 |
| 5. | 03/26/07 Correspondence | App. 0031-0033 |
| 6. | Order Regarding the Appointment of Special Master:<br>Jurisdiction, Duties and Powers of the Special Master | App. 0034-0062 |
| 7. | Declaration of David E. Smith | App. 0063-0069 |
| 8. | Agreed Order Granting Plaintiffs' Motion for An<br>Accounting and an Order to Deposit Disputed Funds | App. 0070-0071 |

9.  Special Master's Order Number One Regarding          App. 0072-0080
    the Process to Effectuate Settlement

10. Special Master's Order Number Two Regarding          App. 0081-0084
    the Process to Effectuate Settlement

11. 09/17/07 Correspondence                              App. 0085-0102
    with attached Stipulation and Protective Order

12. 10/15/07 Correspondence to A Agnewshar,              App. 103-109
    E Reisman, K Ferguson; 10/15/07 correspondence to
    D Smith; 09/27/07 correspondence to A Agneshwar,
    E Reisman, K Ferguson

13. 10/24/07 Email and 11/01/07 Email                    App. 0110-0112

14. 11/06/07 Email                                       App. 0113-0115

15. 11/06/07 Correspondence                              App. 0116-0120

16. 11/10/07 Email                                       App. 121-122

17. 11/15/07 Email with attached Special Master's        App. 0123-0139
    Order Number Three Regarding The Process to
    Effectuate Settlement

18. 11/16/07 Correspondence                              App. 0140-0149

Respectfully submitted,

PEZZULLI KINSER, L.L.P.


By: /s/ Jack B. Krona, Jr.
      Michael F. Pezzulli
      State Bar No. 15881900
      Jack B. Krona, Jr.
      State Bar No. 24005304
      Christopher L. Barnes
      State Bar No. 00792175
      17304 Preston Road, Suite 700
      Dallas, Texas 75252
      972.713.1300
      972.713.1333 fax
      ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served via ECF upon Defendants, Hackard & Holt and Theodore Holt, 11335 Gold Express Drive, Suite 105, Gold River, California 95670, and on Defendant, Michael Hackard, 3600American River Drive, Suite 215, Sacramento, CA, 95864, on November 19, 2007.

           /s/ Michael F. Pezzulli
           Michael F. Pezzulli



# HACKARD & HOLT
## ATTORNEYS AT LAW

THE FIRM | THE ATTORNEYS | PRACTICE AREAS | IN THE NEWS | C

*Find Out More About:*

AVANDIA

VIOXX

PPH

FEN-PHEN

REZULIN

MESOTHELIOMA

GUIDANT AAA DEVICE FAILURE

MEDICAL MALPRACTICE

REDDING MED. CENTER

## LEGAL EXCELLENCE, COMPASSION & UNDERSTANDING

As more and more prescription drugs become available in the United States, the number of lawsuits against major pharmaceutical corporations for defective drugs will continue to increase. With that increase, injured consumers will need capable, skilled attorneys who specialize in this highly complex area of the law.

Hackard & Holt is listed in the Martindale-Hubbell® Bar Register of Preeminent Lawyers, having been designated by our colleagues as preeminent in products liability litigation, our primary area of practice. Hackard & Holt has represented many plaintiffs in nationwide Fen-Phen and Rezulin lawsuits who were seriously injured or lost a loved one to those drugs. Our legal team includes exceptional attorneys and nurse legal assistants working together to represent our clients with compassion and understanding as well as legal excellence.



EXHIBIT

tabbies

E
_____

Homepage | The Firm | The Attorneys | Practice Areas | In The News | Contact Us

© 2005-2006 - Hackard & Holt - All rights reserved - Terms of Use

# HACKARD & HOLT
### ATTORNEYS AT LAW

THE FIRM | THE ATTORNEYS | PRACTICE AREAS | IN THE NEWS | CONTACT US

*Find Out More About:*

**AVANDIA**

**VIOXX**

**PPH**

**FEN-PHEN**
- Urgent Info
- Fen Phen & PPH
- Drug Facts
- News & Resources
- Confidential Contact Form

**REZULIN**

**MESOTHELIOMA**

**GUIDANT AAA DEVICE FAILURE**

**MEDICAL MALPRACTICE**

**REDDING MED. CENTER**

## FEN PHEN

Hackard & Holt is accepting new cases if you have been diagnosed with pulmonary hypertension or require heart valve surgery.

Hackard & Holt is also accepting new cases if you filed the Orange Form to opt out of the class action by March 30, 2000, and have proof of your use of Fen Phen.



**Fen-Phen**

Anecdotal evidence indicates that it is only recently that many former fen phen (fen-phen) users have come to terms with the causes of current physical impairment. This realization often comes about after their physician's review of their echocardiograms.

While the August 1996 New England Journal of Medicine report on "Appetite Suppressants and the Risk of Pulmonary Hypertension" was widely reported at the time, many fen phen (fen-phen) users were not then symptomatic or diagnosed. Now four years later, many former users need heart valve surgery and / or have been diagnosed with pulmonary hypertension.

Valvular dysfunction and blood regurgitation are the injuries associated with fen phen (fen-phen) related injury. Again, some former users are just now being diagnosed with these disorders.

Victims of fen phen (fen-phen) have filed scores of lawsuits around the United States in both state and federal courts. We represent dozens of seriously injured people and we have been fully prosecuting these cases within the judicial confines allowed in the various state and federal coordinated litigation.

While statutes of limitation might impact later accepted cases, we are still reviewing new pulmonary hypertension and heart valve surgery cases and would be happy to speak with you. Please use our contact form or call us on our toll-free telephone number.

American Home Products' agreement to settle will not bind all those injured by fen-phen. While the American Home Chairman and Chief Executive John Stafford called the diet drug controversy a "distraction," this "distraction" will continue to impact the lives of thousands of former fen-phen users and their families. It is not wise for those who have pulmonary hypertension or heart valve surgery to be unrepresented.

If you have moderate to severe heart valve injuries or Primary Pulmonary Hypertension, contact us today for further information as to your rights.

This site is not authorized by the manufacturers of Fen Phen and is not the official site of AHP (Wyeth) or the class action settlement.

© 2005-2006 - Hackard & Holt - All rights reserved - Terms of Use